IN THE SUPREME COURT OF NORTH CAROLINA

No. 228A15

Filed 15 April 2016

NORTH CAROLINA ASSOCIATION OF EDUCATORS, INC., RICHARD J. NIXON, RHONDA HOLMES, BRIAN LINK, ANNETTE BEATTY, STEPHANIE WALLACE, and JOHN DEVILLE

v.

THE STATE OF NORTH CAROLINA

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 776 S.E.2d 1 (2015), affirming orders entered on 6 June 2014 by Judge Robert H. Hobgood in Superior Court, Wake County. On 20 August 2015, the Supreme Court allowed defendant's petition for discretionary review of additional issues. Heard in the Supreme Court on 15 February 2016.

*Patterson Harkavy LLP, by Burton Craige and Narendra K. Ghosh; and National Education Association, by Philip Hostak, pro hac vice, for plaintiff-appellees.*

*Roy Cooper, Attorney General, by John F. Maddrey, Solicitor General; Melissa L. Trippe, Special Deputy Attorney General; and Elizabeth A. Fisher, Assistant Solicitor General, for defendant-appellant.*

*Gray Layton Kersh Solomon Furr & Smith, PA, by Michael L. Carpenter, for North Carolina Retired Governmental Employees' Association, amicus curiae.*

*McGuinness Law Firm, by J. Michael McGuinness, for Southern States Police Benevolent Association and North Carolina Police Benevolent Association, amici curiae.*

*Blanchard, Miller, Lewis & Isley, P.A., by E. Hardy Lewis, for State Employees Association of North Carolina, Inc., amicus curiae.*

EDMUNDS, Justice.

The North Carolina Constitution provides that "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. Until 2013, North Carolina public school teachers were employed under a system usually described generically as the "Career Status Law," through which teachers could earn career status after successfully completing a probationary period and receiving a favorable vote from their school board. N.C.G.S. § 115C-325 (2012). That process changed with passage of the Current Operations and Capital Improvements Appropriations Act of 2013, ch. 360, 2013 N.C. Sess. Laws 995 ("the Act"). Details of the Act are described below, but most pertinent to the case at bar, the Act retroactively revoked the career status of teachers who had already earned that designation by repealing the Career Status Law ("Career Status Repeal"), *id.*, sec. 9.6(a), at 1091, and created a new system of employment for public school teachers, *id.*, secs. 9.6(b) to 9.7(y), at 1091-1116 (hereinafter sections 9.6 and 9.7).

Plaintiffs allege that sections 9.6 and 9.7 of the Act violate Article I, Section 10 of the United States Constitution (forbidding passage of any "Law impairing the Obligation of Contracts") and Article I, Section 19 of the North Carolina Constitution (the Law of the Land Clause), as it applied to teachers who have previously earned career status. We conclude that repeal of the Career Status Law unlawfully infringes upon the contract rights of those teachers who had already achieved career status.

As a result, we hold that sections 9.6 and 9.7 are unconstitutional, though only to the extent that the Act retroactively applies to teachers who had attained career status as of 26 July 2013.

We begin our analysis with an overview of the evolution of state statutes that have controlled career status of public school teachers. For over four decades, North Carolina public schools have operated under what was commonly called the Career Status Law, a statutory framework setting out a system for the employment, retention, and dismissal of public school teachers. However, little in this framework has remained static over the years.

Beginning in 1971, the General Assembly created a procedure through which teachers who were employed for at least three consecutive years as probationers would become "career teachers" if the school board voted to reemploy the teacher for the upcoming school year. *See* Act of July 16, 1971, ch. 883, 1971 N.C. Sess. Laws 1396 (codified at N.C.G.S. § 115-142 (1971)). In addition, any teacher who had been employed in the same public school system for four consecutive years or been employed by the State as a teacher for five consecutive years would automatically became a career teacher. N.C.G.S. § 115-142(c). These career teachers were no longer subject to an annual appointment process, *id.* § 115-142(d), and could only be dismissed for one of twelve grounds specified in the statute, *id.* § 115-142(e)(1). If a teacher was to be dismissed, the act provided for notice and, if requested by the teacher, a review of the recommendation of dismissal by a panel of the Professional

Review Committee prior to termination. *Id.* § 115-142(h). A local school board could choose not to renew its contract with a probationary teacher for any reason that was not "arbitrary, capricious, discriminatory or for personal or political reasons." *Id.* § 115-142(m)(2).

The system originally set up in 1971 has been subject to continual tinkering and revision by the General Assembly. In 1973, the General Assembly added a thirteenth statutory ground for dismissal of a teacher, *id.* § 115-142(e)(1)m (1975), and gave disappointed teachers the option of requesting either a review of a superintendent's dismissal recommendation by a panel of the Professional Review Committee or a hearing before the school board, *id.* § 115-142(h)(3) (1975). *See* Act of May 23, 1973, ch. 782, secs. 12, 20, 1973 N.C. Sess. Laws 1136, 1138, 1139 (codified at N.C.G.S. § 115-142 (1975)). In 1979, a fourteenth statutory ground for dismissal or demotion was added. *See* Act of June 8, 1979, ch. 864, sec. 2, 1979 N.C. Sess. Laws 1185, 1188 (codified at N.C.G.S. § 115-142(e)(1)n (1979)).

The next significant change came in the 1983 legislative session. The General Assembly amended the 1979 law to provide that, after a teacher had taught for three, four, or five consecutive years in a school system with more than 70,000 students, the local school board had authority to grant the teacher career status, reappoint the teacher to another probationary one-year contract, or decline to reappoint the teacher. *See* Act of May 26, 1983, ch. 394, 1983 N.C. Sess. Laws 301 (codified at N.C.G.S. § 115C-325(c)(1) (1985)). At the end of the probationary teacher's sixth year,

the school board's choices were limited to appointment to career teacher status or nonrenewal of the appointment. N.C.G.S. § 115C-325(c)(1). However, the General Assembly did not extend this program, so after 1 July 1985 the process through which teachers received career status reverted to the 1981 system. *See* Ch. 394, sec. 6, 1983 N.C. Sess. Laws at 302. In 1992, a new statutory ground for dismissal was added, along with an amendment allowing a teacher who was being considered for dismissal to request a hearing either before the local school board or before a panel of the Professional Review Committee (instead of the previously provided investigation of the superintendent's recommendation by the Professional Review Committee). *See* Act of July 14, 1992, ch. 942, 1991 N.C. Sess. Laws (Reg. Sess. 1992) 730 (codified at N.C.G.S. § 115C-325(e)-(j) (1992)). Under either option, the hearing procedure was set out in subsection 115C-325(j). N.C.G.S. § 115C-325(e)(2), (h)(3), (i)(2) (1992).

In 1997, the General Assembly enacted a comprehensive set of statutes that included measures aimed at improving student academic achievement, enhancing teacher skills and knowledge, and implementing a system to review more rigorous teacher preparation, professional development, and certification standards. *See* The Excellent Schools Act, ch. 221, 1997 N.C. Sess. Laws 427. The new law enacted, amended, or repealed many provisions related to education and included significant changes to section 115C-325. For example, the act increased from three to four the number of years of consecutive service a teacher had to complete before becoming eligible for career status. *See* N.C.G.S. § 115C-325(c)(1) (1997). This act also

expanded the definition of "demote" to include some circumstances under which a career teacher was suspended without pay and excluded circumstances where bonus payments were reduced or eliminated. *Id.* § 115C-325(a)(4) (1997). The Professional Review Committee system was eliminated and replaced with case managers who were certified mediators specially trained by the State Board of Education. *Id.* § 115C-325(h)-(h1) (1997). Career employees being recommended for dismissal or demotion had the option of choosing between a hearing in front of a case manager, governed by subsection 115C-325(j), or a hearing in front of the school board, conducted pursuant to subsection 115C-325(j2). *Id.* § 115C-325(h)(3) (1997). In 2009, the legislature amended the statute to add procedural protections for probationary teachers. *See* Act of July 13, 2009, ch. 326, 2009 N.C. Sess. Laws 528 (codified at N.C.G.S. § 115C-325(m)(3)-(4) (2009)).

In 2011, the legislature eliminated case managers and replaced them with hearing officers before whom career status teachers could request a hearing prior to dismissal or demotion. *See* Act of June 17, 2011, ch. 348, sec. 1, 2011 N.C. Sess. Laws 1464, 1464 (codified at N.C.G.S. § 115C-325(a)(4c), (h)(3), (h1) (2011)). The act also provided a definition for "inadequate performance," one of the original statutory grounds for dismissal or demotion of a career employee. N.C.G.S. § 115C-325(e)(3) (2011).

The employment system in place at the time of the passage of the Act was codified under N.C.G.S. § 115C-325 (2012) and established two classes of public school

teachers. Probationary teachers were defined in N.C.G.S. § 115C-325(a)(5), while career teachers were defined in N.C.G.S. § 115C-325(a)(1c). Probationary teachers were employed through annual contracts with the local board of education. *Id.* § 115C-325(m)(2). These contracts were subject to nonrenewal for any reason that was not "arbitrary, capricious, discriminatory or for personal or political reasons." *Id.* The school board would vote on whether to grant career status to a probationary teacher who had been employed by that school system for four consecutive years. *Id.* § 115C-325(c)(1). Probationary teachers eligible for such a vote had the right to notice and a hearing before the board's vote if the superintendent did not intend to recommend the teacher for career status. *Id.* § 115C-325(m)(3)-(4). Upon a vote to grant career status, probationary teachers would enter into a career contract with their employing local board of education.

Career status teachers could only be dismissed, demoted, or relegated to part-time status based on one or more of fifteen specified statutory grounds. *Id.* § 115C-325(e)(1). Prior to making a recommendation for dismissal, demotion, or relegation to part-time status of a career status teacher, the superintendent was required to give written notice of the grounds on which he or she believed the action to be justified. *Id.* § 115C-325(e)(2). Upon receipt of such written notice, a career teacher had a right to request a hearing before a hearing officer to contest the superintendent's recommendation, at which the career teacher was entitled "to be present and to be heard, to be represented by counsel and to present through witnesses any competent

testimony relevant to the issue of whether grounds for dismissal or demotion exist." *Id.* § 115C-325(j)(3). The decision of the hearing officer could be further appealed to the full school board. *Id.* § 115C-325(j1)(1). The board could approve dismissal or demotion of a career teacher after undertaking a whole record review to determine whether the hearing officer's findings of fact were supported by substantial evidence. *Id.* § 115C-325(j2)(7).

This summary demonstrates that the General Assembly's treatment of career teacher status has changed significantly over the last forty years. Now the Career Status Law, N.C.G.S. § 115C-325 (2012), is no more. The changes under review here occurred in 2013, when the General Assembly passed the Act. Ch. 360, 2013 N.C. Sess. Laws at 995. The Act revokes career status for all teachers as of 1 July 2018. *Id.*, sec. 9.6(i), at 1103. Under the new system, teacher contracts are not open-ended, as was previously the case for career teachers, but instead extend "for a term of one, two, or four school years." N.C.G.S. § 115C-325.3(a) (2015). A decision not to renew a teacher's contract can be based on any reason not "arbitrary, capricious, discriminatory, for personal or political reasons, or on any basis prohibited by State or federal law." *Id.* § 115C-325.3(e) (2015). The superintendent must give the teacher written notice of a decision to recommend nonrenewal. *Id.* § 115C-325.3(d) (2015). Within ten days of receiving such notice, the teacher can petition the local school board for a hearing, but the school board has discretion whether to grant the request. *Id.* § 115C-325.3(e). Dismissal, demotion, or a change to part-time status during the

term of the contract remains based on the fifteen statutory grounds and procedure set forth previously in the Career Status Law. *Id.* § 115C-325.4(a) (2015). Any teacher who had not achieved career status "prior to the 2013-2014 school year" is no longer eligible to receive career status in the future and will instead be employed primarily by one-year contracts, "except for qualifying teachers offered a four-year contract as provided in subsection (g) of this section, until the 2018-2019 school year." Ch. 360, sec. 9.6(f), 2013 N.C. Sess. Laws at 1103.[1]

On 17 December 2013, the North Carolina Association of Educators, Inc. (NCAE), five tenured public school teachers, and one probationary public school teacher filed a complaint in Superior Court, Wake County, challenging the constitutionality of the repeal of the Career Status Law under both the North Carolina and United States Constitutions. In their first claim for relief, plaintiffs alleged that the repeal constituted a "taking of property without just compensation in violation of Article I, Section 19 of the North Carolina Constitution." Plaintiffs further contended the repeal was an "impairment of contracts in violation of Article I, Section 10 of the United States Constitution." Plaintiffs requested a declaration

---

[1] Subsections 9.6(g) and (h), which never went into effect, would have required superintendents to review the performance and evaluations of all teachers employed in their schools for at least three consecutive years and recommend one-quarter of those teachers to receive a four-year contract beginning in the 2014-15 school year. Ch. 360, sec. 9.6(f), 2013 N.C. Sess. Laws at 1103. The selected teachers would receive a five-hundred dollar annual pay raise for each year of the four-year contract in exchange for the relinquishing of career status. *Id.*, sec. 9.6(g)-(h), at 1103.

that sections 9.6 and 9.7 of the Act are unconstitutional under both constitutions as applied retroactively to revoke career status from teachers who had previously earned that designation, and also as applied prospectively to probationary teachers who were employed by the public schools before the repeal and had been on a track leading to eligibility for career status. Plaintiffs also sought "a permanent injunction against the implementation and enforcement" of both sections as to all tenured and probationary teachers who were employed by public schools as of 26 July 2013.

On 17 January 2014, the State filed its answer denying all of plaintiffs' allegations. The State also filed a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, arguing that plaintiffs failed to state a legal claim upon which relief may be granted. On 10 March 2014, plaintiffs filed a motion for summary judgment, along with supporting affidavits, and the State responded with affidavits opposing plaintiffs' motion. After a 12 May 2014 hearing, the trial court on 6 June 2014 entered an order granting in part plaintiffs' motion as to the retroactive revocation of career status from teachers who already held that status. As to the claims brought on behalf of teachers who had not yet earned career status, the trial court denied in part plaintiffs' motion for summary judgment and granted summary judgment in favor of the State. The trial court declared unconstitutional sections 9.6 and 9.7 of the Act as they apply to career status teachers as of 26 July 2013. The court further enjoined the State from implementing and enforcing those provisions as to teachers holding career status on 26 July 2013, and also denied the State's oral

motion to stay the trial court's permanent injunction. Plaintiffs and defendant filed separate notices of appeal.

The Court of Appeals unanimously affirmed the trial court's decision to grant summary judgment in favor of the State as to plaintiffs' claims on behalf of probationary teachers. *NCAE*, ___ N.C. App. ___, ___, 776 S.E.2d 1, 23-24 (2015) (majority); *id.* at ___, 776 S.E.2d at 24 (Dillon, J., concurring in part and dissenting in part). That decision was not appealed to this Court and we do not address it further. However, the Court of Appeals was divided as to career status teachers. The majority rejected the State's argument that the trial court erred as a matter of law when it granted summary judgment in favor of plaintiffs on the issue of whether retroactive application of the Career Status Repeal violated the Contract Clause of the United States Constitution. *Id.* at ___, 776 S.E.2d at 9 (majority). The majority acknowledged that in *Bailey v. State*, 348 N.C. 130, 500 S.E.2d 54 (1998), this Court set out a three-part test for analyzing an alleged violation of the United States Constitution's Contract Clause. *NCAE*, ___ N.C. App. at ___, 776 S.E.2d at 9-10. Under that test, the reviewing court considers "(1) whether a contractual obligation is present, (2) whether the state's actions impaired that contract, and (3) whether the impairment was reasonable and necessary to serve an important public purpose." *Bailey*, 348 N.C. at 141, 500 S.E.2d at 60 (citing *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977)). Applying the *Bailey* test and analyzing cases from this Court and the United States Supreme Court, the

majority found that, as to the existence of a contractual right, the Career Status Law was a "statutory promise" and that, upon satisfying its requirements and achieving career status, plaintiffs "earned a vested right to career status protections." *NCAE*, ___ N.C. App. at ___, 776 S.E.2d at 12. In considering next whether those statutory contractual rights were substantially impaired by the State's actions, the majority concluded that eliminating career contracts in favor of contracts for one, two, or four years substantially impaired the rights promised to plaintiffs. *Id.* at ___, 776 S.E.2d at 13. The majority also held that a school board's discretionary ability to deny renewal of a contract for a term of years without a hearing was a substantial change from the previous law's requirement of a hearing prior to imposition of termination, demotion, or other discipline. *Id.* at ___, 776 S.E.2d at 13. Accordingly, the court had "no trouble concluding that the trial court was correct in its determination that the Career Status Repeal substantially impairs Plaintiffs' vested contractual rights." *Id.* at ___, 776 S.E.2d at 13.

Finally, the Court of Appeals was unpersuaded by the State's argument that the General Assembly repealed the Career Status Law in order to improve the public school systems by providing a method under which schools more easily could rid themselves of ineffective teachers. *Id.* at ___, 776 S.E.2d at 14. The court found the contention that these measures would improve the school system to be baseless and unsupported by the affidavits submitted by both parties. *Id.* at ___, 776 S.E.2d at 14. Even assuming the State's purpose was an important one, the majority was

unconvinced that repealing the Career Status Law "was a reasonable and necessary means to advance that purpose." *Id.* at ___, 776 S.E.2d at 15. The majority found that no evidence suggested that the approach embodied in the Act served the purpose of removing incompetent teachers, particularly when less drastic alternatives exist for the reform of public education. *Id.* at ___, 776 S.E.2d at 15-16. The majority concluded that the trial court correctly found the repeal of the Career Status Law violated the United States Constitution's Contract Clause as to teachers who had already earned career status at the time of repeal. *Id.* at ___, 776 S.E.2d at 16. Based on this Contract Clause violation, the Court of Appeals further held that plaintiffs' contract right was a property interest that was being unjustly taken away by the repeal without compensation to plaintiffs, in violation of the Law of the Land Clause of the North Carolina Constitution. *Id.* at ___, 776 S.E.2d at 16-18.

The dissenting judge argued that the repeal is unconstitutional to the extent that it allows career status teachers to be stripped of a protected property interest without a hearing. *Id.* at ___, 776 S.E.2d at 25 (Dillon, J., concurring in part and dissenting in part). Nevertheless, the dissenting judge would not hold that the Career Status Law created any contractual rights, *id.* at ___, 776 S.E.2d at 28, and except for the portion giving local boards the discretion whether to hold a hearing before depriving a career teacher of his or her property interest in continued employment, would find the repeal of that law constitutional on its face, *id.* at ___, 776 S.E.2d at

29. The State appealed to this Court on the basis of the dissenting opinion and we granted the State's petition for discretionary review as to additional related issues.

This Court presumes that statutes passed by the General Assembly are constitutional, *State v. Packingham*, 368 N.C. 380, 382-83, 777 S.E.2d 738, 742 (2015) (citing *Wayne Cty. Citizens Ass'n for Better Tax Control v. Wayne Cty. Bd. of Comm'rs*, 328 N.C. 24, 29, 399 S.E.2d 311, 314-15 (1991)), and duly passed acts will not be struck unless found unconstitutional beyond a reasonable doubt, *Morris v. Holshouser*, 220 N.C. 293, 295, 17 S.E.2d 115, 117 (1941). Even so, we review de novo any challenges to a statute's constitutionality. *Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.*, 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001) (citations omitted).

Plaintiffs first allege that the Career Status Repeal violated Article I, Section 10 of the Constitution of the United States by impairing the contract rights of teachers who had earned career status before the repeal. The Contract Clause, "one of the few express limitations on state power" in the Constitution, *U.S. Tr. Co.*, 431 U.S. at 14, 97 S. Ct. at 1514, 52 L. Ed. 2d at 104, provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts," U.S. Const. art. I, § 10. As the Court of Appeals correctly recognized, this Court uses the three-factor test set out in *Bailey* to determine whether a Contract Clause violation exists. *Bailey*, 348 N.C. at 141, 500 S.E.2d at 60 (citing *U.S. Tr. Co.*, 431 U.S. 1, 97 S. Ct. 1505, 52 L. Ed. 2d 92).

Accordingly, we first consider whether any contractual obligation arose from the statute making up the now-repealed Career Status Law. The United States Supreme Court has recognized a presumption that a state statute "is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Dodge v. Bd. of Educ.*, 302 U.S. 74, 79, 58 S. Ct. 98, 100, 82 L. Ed. 57, 62 (1937). This presumption is rooted in the long-standing principle that the primary function of a legislature is to make policy rather than contracts. *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 100, 58 S. Ct. 443, 446, 82 L. Ed. 685, 690 (1938). A party asserting that a legislature created a statutory contractual right bears the burden of overcoming that presumption, *Dodge*, 302 U.S. at 79, 58 S. Ct. at 100, 82 L. Ed. at 62, by demonstrating that the legislature manifested a clear intention to be contractually bound, *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466, 105 S. Ct. 1441, 1451, 84 L. Ed. 2d 432, 446 (1985). Construing a statute to create contractual rights in the absence of an expression of unequivocal intent would be at best ill-advised, binding the hands of future sessions of the legislature and obstructing or preventing subsequent revisions and repeals. *See Kornegay v. City of Goldsboro*, 180 N.C. 441, 451, 105 S.E. 187, 192 (1920). We are deeply reluctant to "limit drastically the essential powers of a legislative body" by finding a contract created by statute without compelling supporting evidence. *Nat'l R.R.*, 470 U.S. at 466, 105 S. Ct. at 1451, 84 L. Ed. 2d at 446; *see also Mial v. Ellington*, 134 N.C. 131, 153, 46 S.E. 961, 968 (1903)

("[M]any things done by the State may seem to hold out promises to individuals which, after all, cannot be treated as contracts without hampering the legislative power of the State in a manner that would soon leave it without the means of performing its essential functions.").

This requirement for explicit indications of legislative intent is shown in two United States Supreme Court cases in which the use or omission of the word "contract" in the statute was deemed critical. In *Phelps v. Board of Education*, 300 U.S. 319, 57 S. Ct. 483, 81 L. Ed. 674 (1937), that Court considered a New Jersey employment system where, after completing three years of service, teachers were hired for an ongoing open-ended period during which they could not be dismissed or subjected to a reduction in salary without notice and a hearing. *Id.* at 320-21, 57 S. Ct. at 484, 81 L. Ed. at 676. The Supreme Court found that this system did not set up a contract but instead "established a legislative status for teachers," *id.* at 322, 57 S. Ct. at 484, 81 L. Ed. at 676, and was a "regulation of the conduct of the board" that created no binding obligation, *id.* at 323, 57 S. Ct. at 485, 81 L. Ed. at 677. However, the Court shortly thereafter distinguished *Phelps* in *Brand*, 303 U.S. 95, 58 S. Ct. 443, 82 L. Ed. 685, when it held that Indiana's "Teachers' Tenure Act" created a statutory contractual right between the teachers and a local school district. In *Brand*, the Court looked specifically to the language of Indiana's Act, noting that the word "contract" was peppered throughout nearly every section of the statute. *Id.* at 105, 58 S. Ct. at 448, 82 L. Ed. at 693 ("The title of the Act is couched in terms of contract.

It speaks of the making and cancelling of indefinite contracts. In the body the word 'contract' appears ten times in § 1, eleven times in § 2, and four times in § 4 . . . .").

These cases indicate that courts must consider the language used by the legislature to determine whether a statute "provides for the execution of a written contract on behalf of the state." *Dodge*, 302 U.S. at 78, 58 S. Ct. at 100, 82 L. Ed. at 61. North Carolina's Career Status Law does not present the type of unmistakable legislative intent found by the United States Supreme Court in the statute at issue in *Brand*. Nowhere in the portion of section 115C-325 establishing the promotion of a teacher to career status does the word "contract" appear. *Compare* N.C.G.S. § 115C-325(c)(1) (2012), *with Brand*, 303 U.S. at 101 n.14, 58 S. Ct. at 446 n.14, 82 L. Ed. at 691 n.14 (discussing the Indiana statute's frequent use of that term). The word "contract," as used in the remainder of our Career Status Law refers only to individual contracts with the local school boards and relationships between teachers and the local school system, with no mention of the State.

Turning next to cases from this Court, we considered an alleged Contract Clause violation in the context of retirement benefits in *Bailey*, 348 N.C. 130, 500 S.E.2d 54, and in the context of disability retirement payments in *Faulkenbury v. Teachers' & State Employees' Retirement System of North Carolina*, 345 N.C. 683, 483 S.E.2d 422 (1997). In both cases, this Court held that vested contractual rights were created by the statutes at issue because, at the moment the plaintiffs fulfilled the conditions set out in the two benefits programs, the plaintiffs earned those benefits.

Though the benefits would be received at a later time, the plaintiffs' right to receive them accrued immediately, became vested, and a contract was formed between the plaintiffs and the State. *Bailey*, 348 N.C. at 138, 500 S.E.2d at 58 ("After employment for the set number of years, an employee is deemed to have 'vested' in the retirement system."); *Faulkenbury*, 345 N.C. at 692, 483 S.E.2d at 428 (stating that the plaintiffs fulfilled their condition of working for five years and "[a]t that time, the plaintiffs' rights to benefits in case they were disabled became vested"). In other words, neither the retirement benefits in *Bailey* nor the disability payments in *Faulkenbury* were based upon future actions by the plaintiffs. Instead, those benefits had been presently earned and became vested as the plaintiffs performed, even though payment of those benefits was deferred until a later time.

In contrast, a teacher has no vested career status rights at the end of the probationary period. Instead, after successfully meeting all the requirements, a teacher could enter a career contract with the school board. Thus, we see that the Career Status Act is a regulation of conduct through which local school boards can exercise their discretion to enter into contracts with teachers for whom they approve career status. The Career Status Law contemplates the creation of individual contracts between school boards and teachers but does not itself establish any benefit provided to teachers by the State nor create any relationship between them. As a result, plaintiffs have not overcome the strong presumption against finding a vested right created by the Career Status Law.

In addition, the oft-amended course of the Career Status Law over the decades is evidence that the State did not intend to create a contract with teachers by the terms of the statute. Each new version of the statute did not immediately create a vested contract between the State and public school teachers. The amendments instead altered details of career status while leaving the overall career status system intact, thereby allowing the possibility of future modifications and amendments as needs arose. Accordingly, we conclude the Career Status Law did not itself create any vested contractual rights.

However, our analysis does not end here. "[L]aws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429-30, 54 S. Ct. 231, 237, 78 L. Ed. 413, 424 (1934) (quoting *Von Hoffman v. City of Quincy*, 71 U.S. (4 Wall.) 535, 550, 18 L. Ed. 403, 408 (1866)). Before receiving career status, plaintiffs entered individual contracts with the local school boards. Implied as a part of each of these contracts was the Career Status Law. As the State concedes in its brief, the "applicable statutory terms must be read into the contracts" and the contracts "[i]ncorporat[ed] the statutory body of 'school law' applicable to Plaintiffs as teachers." The statutory system that was in the background of the contract between the teacher and the board set out the mechanism through which the teachers could obtain career status. A teacher's career status rights under the Career Status Law become vested only upon completing several

consecutive years as a probationary teacher and then receiving approval from the school board. Thus, vesting stems not from the Career Status Law, but from the teacher's entry into an individual contract with the local school system. At the time the parties made the contract, the right to career status vested. At that point, the General Assembly no longer could take away that vested right retroactively in a way that would substantially impair it.

The record demonstrates the importance of those protections to the parties and the teachers' reliance upon those benefits in deciding to take employment as a public school teacher. For instance, in his affidavit, Bruce W. Boyles, Cleveland County Superintendent of Schools, stated that "[t]eachers rely upon their career status rights in making employment decisions"; "[w]hen interviewing and hiring teachers, teachers frequently ask about career status rights"; and such protections have value to prospective teachers which "makes up for not having better monetary compensation." The affidavits of plaintiffs Annette Beatty, John deVille, Rhonda Holmes, Richard J. Nixon, and Stephanie Wallace establish that they were promised career status protections in exchange for meeting the requirements of the law, relied on this promise in exchange for accepting their teacher positions and continuing their employment with their school districts, and consider the benefits and protections of career status to offset the low wages of public school teachers. Thus, we conclude that, although the Career Status Law itself created no vested contractual rights, the

contracts between the local school boards and teachers with approved career status included the Career Status Law as an implied term upon which teachers relied.

We next move to the second part of a Contract Clause analysis in which we consider whether the vested rights found above were substantially impaired by the Career Status Repeal. *U.S. Tr. Co.*, 431 U.S. at 17, 97 S. Ct. at 1515, 52 L. Ed. 2d at 106. "Total destruction of contractual expectations is not necessary for a finding of substantial impairment." *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 411, 103 S. Ct. 697, 704, 74 L. Ed. 2d 569, 580 (1983) (citing *U.S. Tr. Co.*, 431 U.S. at 26-27, 97 S. Ct. at 1519-20, 52 L. Ed. 2d at 112). However, a showing that the change in the law results in an outcome different from that "reasonably expected from the contract" may be sufficient to show a substantial deprivation. *Id.* at 411, 103 S. Ct. at 704, 74 L. Ed. 2d at 580. Plaintiffs contend that the repeal of the Career Status Law and its protections substantially impairs the contractual rights for which they bargained.

The benefits enjoyed by career teachers have been described above, most of which boil down to enhanced job security. The Career Status Law establishing those benefits was replaced by a new system that eliminates career status entirely, allowing local school boards and teachers to enter into contracts in durations of only one, two, or four years. N.C.G.S. § 115C-325.3(a) (2015). Nonrenewal of these shortened contracts can be based on any reason not "arbitrary, capricious, discriminatory, for personal or political reasons, or on any basis prohibited by State

or federal law." *Id.* § 115C-325.3(e) (2015). If the superintendent recommends that a teacher not be renewed, the teacher can petition for a hearing but the school board has unrestricted discretion whether to grant or deny that request. *Id.*

We hold that these changes are a substantial impairment of the bargained-for benefit promised to the teachers who have already achieved career status. Retroactively revoking this status from those whose career status rights had already vested deprives career teachers of the promise of continuing employment, as well as the right to a hearing in circumstances in which their now-shortened contracts may not be renewed. Plaintiffs' affidavits indicate they relied both on the promise of continued employment as a form of added compensation to supplement their lower salaries and on the benefits of career status when deciding to continue teaching in the public school systems. Elimination of these benefits substantially deprives current career status teachers of the value of their vested contractual rights.

Under the third prong of the *Bailey* test, a substantial impairment of contractual rights can still be upheld if the impairment was a reasonable and necessary means of serving a legitimate public purpose. *U.S. Tr. Co.*, 431 U.S. at 25, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112. The Contract Clause is not meant to bind the hands of the State absolutely. The Clause's "prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.' " *Energy Reserves Grp.*, 459 U.S. at 410, 103 S. Ct. at 704, 74 L. Ed. 2d at 580 (quoting *Blaisdell*, 290 U.S. at 434, 54 S. Ct. at 239, 78 L. Ed. at 426). Courts weigh a state's

interest in exercising its police power against the impairment of individual contractual rights when determining whether the impairment is sufficiently justified. This portion of the inquiry involves a two-step process, first identifying the actual harm the state seeks to cure, then considering whether the remedial measure adopted by the state is both a reasonable and necessary means of addressing that purpose. *See id.* at 412, 103 S. Ct. at 705, 74 L. Ed. 2d at 581.

Accordingly, we consider the interest the State argues is furthered by repealing the Career Status Law. The burden is upon the State when it seeks to justify an otherwise unconstitutional impairment of contract. *U.S. Tr. Co.*, 431 U.S. at 31, 97 S. Ct. at 1522, 52 L. Ed. 2d at 115. Relying on Article I, Section 15 of our constitution, which establishes the duty of the State to guard and maintain the people's right to the privilege of education, the State claims that improving public education is an essential constitutional responsibility. *Hoke Cty. Bd. of Educ. v. State*, 358 N.C. 605, 614-15, 599 S.E.2d 365, 376 (2004) ("[T]he State and State Board of Education had constitutional obligations to provide the state's school children with an opportunity for a sound basic education, and that the state's school children had a fundamental right to such an opportunity." (citing *Leandro v. State*, 346 N.C. 336, 351, 488 S.E.2d 249, 257 (1997))). The State argues that "the goal of the Career Status Repeal was to address 'adequate' but marginal teachers with career status" as part of a series of reforms intended to improve the deficiencies in the State's public school system.

We fully agree that maintaining the quality of the public school system is an important purpose. Nevertheless, while alleviating difficulties in dismissing ineffective teachers might be a legitimate end justifying changes to the Career Status Law, no evidence indicates that such a problem existed. Instead, the record is replete with affidavits from teachers and administrators who relate that the Career Status Law did not impede their ability to dismiss teachers who failed to meet the academic standards necessary properly to educate students in public schools. Instead, these affiants indicate that the Career Status Law was an important incentive in recruiting and retaining high-quality teachers. Inadequate teachers could be and were dismissed under the Career Status Law on the statutory grounds laid out in N.C.G.S. § 115C-325(e)(1) (2012), including dismissal for "[i]nadequate performance," defined in the Career Status Law as "(i) the failure to perform at a proficient level on any standard of the evaluation instrument or (ii) otherwise performing in a manner that is below standard," *id.* § 115C-325(e)(3) (2012). Accordingly, we fail to see a legitimate public purpose for which it was necessary substantially to impair the vested contractual rights of career status teachers.

Moreover, even if we conclude that a legitimate public purpose did exist justifying such an impairment, the method adopted for alleviating that harm must be necessary and reasonable. *U.S. Tr. Co.*, 431 U.S. at 25, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112. While we acknowledge that the retroactive repeal was motivated by the General Assembly's valid concern for flexibility in dismissing low-performing

teachers, we do not see how repealing career status from those for whom that right had already vested was necessary and reasonable. "[A] State is not free to impose a drastic impairment [of contract] when an evident and more moderate course would serve its purposes equally well." *Id.* at 31, 97 S. Ct. at 1522, 52 L. Ed. 2d at 115. In the record, plaintiffs suggest several alternatives to retroactive repeal of the Career Status Law that would allow school boards more flexibility in dismissing low-quality teachers. The legislature could add additional grounds for dismissal as it did in 1973, *see* Ch. 782, sec. 12, 1973 N.C. Sess. Laws at 1138, in 1979, *see* Ch. 864, sec. 2, 1979 N.C. Sess. Laws at 1188, and in 1992, *see* Ch. 942, sec. 1, 1991 N.C. Sess. Laws (Reg. Sess. 1992) at 730. Or the General Assembly could have refined the definition of "inadequate performance" as it did in 2011. *See* Ch. 348, sec. 1, 2011 N.C. Sess. Laws at 1464. Given the possibility of such less sweeping alternatives for improving teacher quality, "the State has failed to demonstrate" why the retroactive repeal was necessary and reasonable. *U.S. Tr. Co.*, 431 U.S. at 31, 97 S. Ct. at 1522, 52 L. Ed. 2d at 115.

Because we hold the repeal is unconstitutional in its retroactive application based on the Contract Clause of the United States Constitution, we need not address plaintiffs' alternative claim based on Article I, Section 19 of the North Carolina Constitution. Accordingly, we conclude that the retroactive repeal of career status from those teachers who had earned that designation prior to the Career Status Repeal is unconstitutional. The vested contractual rights of those teachers were

substantially impaired without adequate justification, in violation of the Contract

Clause of the United States Constitution.

MODIFIED AND AFFIRMED.