IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-1027

Filed 15 August 2023

Wilson County, No. 21 CVS 1471

WILSON COUNTY BOARD OF EDUCATION, Petitioner,

v.

RETIREMENT SYSTEMS DIVISION, DEPARTMENT OF STATE TREASURER, TSERS BOARD OF TRUSTEES; TIM MOORE, NORTH CAROLINA SPEAKER OF THE HOUSE; AND PHILIP E. BERGER, PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE, Respondents.

Appeal by Respondents from orders entered 18 March 2022 and 13 June 2022 by Judge William D. Wolfe in Wilson County Superior Court. Heard in the Court of Appeals 7 June 2023.

*Poyner Spruill LLP, by Laura E. Crumpler and Katie G. Cornetto, for Petitioner-Appellee.*

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Olga E. Vysotskaya de Brito, for Respondents-Appellants.*

COLLINS, Judge.

This case involves legislation passed by the General Assembly which established a contribution-based benefit cap on retirement benefits for certain State employees who retire on or after 1 January 2015. *See* N.C. Gen. Stat. § 135-5 (2022). The legislation is designed to control the practice of "pension spiking," where an employee's compensation substantially increases to create a retirement

benefit that is significantly greater than the employee's contributions would fund. The Retirement Systems Division of the Department of the State Treasurer; the Teachers' and State Employees' Retirement System Board of Trustees; Tim Moore, North Carolina Speaker of the House; and Philip Berger, President Pro Tempore of the North Carolina Senate (collectively, "Respondents") appeal from the superior court's orders entered 18 March 2022 denying their Rule 12(b)(1), (2), and (6) motion to dismiss the Wilson County Board of Education's ("Petitioner") petition for judicial review and 13 June 2022 reversing the administrative law judge's grant of summary judgment in Respondents' favor and granting summary judgment in Petitioner's favor.

We hold that the superior court erred by concluding that N.C. Gen. Stat. § 135-5(a3) violates Article I, Section 10, of the United States Constitution; violates Article IX, Section 7(a), of the North Carolina Constitution; and was impermissibly retroactively applied to Petitioner. Furthermore, the superior court erred by denying Respondents' Rule 12(b)(6) motion to dismiss the action against Speaker Moore and President Pro Tempore Berger. Accordingly, we reverse.

## I.    Background

### A. Statutory Background

The Teachers' and State Employees' Retirement System ("TSERS") provides retirement allowances, or pensions, for teachers and other types of employees of the State of North Carolina. N.C. Gen. Stat. § 135-2 (2022). Any member of TSERS

who has vested in the system is entitled to receive a lifetime pension once eligible to retire, and the amount an employee is entitled to receive is determined by a statutory formula. *See id.* § 135-5.

The TSERS pension fund is funded by a combination of employee and employer contributions. *Id.* §§ 135-8(b), (d). The employee contribution rate is statutorily set at 6% of the employee's compensation and is automatically deducted from the employee's paycheck. *Id.* § 135-8(b)(1). An employer is required to contribute "a certain percentage of the actual compensation of each member[,]" known as the "normal contribution," and "an additional amount equal to a percentage of the member's actual compensation[,]" known as the "accrued liability contribution." *Id.* § 135-8(d)(1). The employer contribution rate fluctuates and is "calculated annually by the actuary using assumptions and a cost method . . . selected by the Board of Trustees." *Id.* § 135-8(d)(2a).

In 2014, the General Assembly enacted An Act to Enact Anti-Pension-Spiking Legislation by Establishing a Contribution-Based Benefit Cap (the "Act"), 2014 N.C. Sess. Laws 88, which is codified in relevant part by N.C. Gen. Stat. § 135-5(a3). The Act establishes a retirement benefit cap applicable to employees with an average final compensation greater than $100,000 whose pension would otherwise be

significantly greater than the accumulated contributions[1] made by that employee during their employment with the State. N.C. Gen. Stat. § 135-5(a3). "Average final compensation" is defined as "the average annual compensation of a member during the four consecutive calendar years of membership service producing the highest such average[.]" *Id.* § 135-1(5).

The Act directs the TSERS Board of Trustees to establish a "contribution-based benefit cap factor recommended by the actuary, based upon actual experience, such that no more than three-quarters of one percent (0.75%) of retirement allowances are expected to be capped." *Id.* § 135-5(a3). For every member retiring on or after 1 January 2015, the TSERS Board of Trustees is required to perform the following analysis: (1) determine the amount of the employee's accumulated contributions to TSERS; (2) determine the amount of a single life annuity[2] that is the actuarial equivalent of the employee's accumulated contributions; (3) multiply the annuity by the contribution-based cap factor; and (4) calculate the employee's expected pension based upon the employee's membership service. *Id.*

If the employee's expected pension exceeds the calculated contribution-based

---

[1] "Accumulated contributions" is defined as "the sum of all the amounts deducted from the compensation of a member and accredited to his individual account in the annuity savings fund[.]" N.C. Gen. Stat. § 135-1(1) (2022).

[2] "Annuity" is defined as "payments for life derived from that 'accumulated contribution' of a member." N.C. Gen. Stat. § 135-1(3) (2022). "Actuarial equivalent" is defined as "a benefit of equal value when computed upon the basis of actuarial assumptions as shall be adopted by the Board of Trustees." *Id.* § 135-1(2).

benefit cap, the employee's pension will be capped. *Id.* If, however, an employee became a member of TSERS before 1 January 2015, the employee's pension will not be capped; instead, the employee's last employer must contribute the amount "that would have been necessary in order for the retirement system to restore the member's retirement allowance to the pre cap amount." *Id.* §§ 135-5(a3), 135-8(f)(2)(f).

## B. Adoption of the Cap Factor

During a 23 October 2014 meeting, the TSERS Board of Trustees adopted a cap factor of 4.8 for retirements that became effective on or after 1 January 2015. During a 22 October 2015 meeting, the TSERS Board of Trustees adopted a cap factor of 4.5 for retirements that became effective on or after 1 January 2016. In late 2016, the Cabarrus County Board of Education requested a declaratory ruling from the Retirement Systems Division that the cap factor was invalid because the TSERS Board of Trustees did not adopt the cap factor through rulemaking pursuant to the Administrative Procedure Act ("APA"), and that an invoice sent by the Retirement Systems Division for an additional contribution was consequently void.[3] *Cabarrus Cnty. Bd. of Educ. v. Dep't of State Treasurer*, 261 N.C. App. 325,

---

[3] The Johnston County Board of Education, Wilkes County Board of Education, and Union County Board of Education also filed requests for declaratory rulings. *See Johnston Cnty. Bd. of Educ. v. Dep't of State Treasurer*, 261 N.C. App. 537, 817 S.E.2d 918 (2018) (unpublished); *Wilkes Cnty. Bd. of Educ. v. Dep't of State Treasurer*, 261 N.C. App. 540, 818 S.E.2d 199 (2018) (unpublished); *Union Cnty. Bd. of Educ. v. Dep't of State Treasurer*, 261 N.C. App. 539, 817 S.E.2d 919 (2018) (unpublished).

328, 821 S.E.2d 196, 200 (2018). The Retirement Systems Division denied the requested ruling. *Id.* On judicial review, the superior court granted summary judgment in the school board's favor and this Court affirmed, holding that "[t]he Division erred in invoicing . . . [the Cabarrus County Board of Education] for any additional contributions pursuant to N.C.G.S. § 135-5(a3) because the cap factor adopted by the Board . . . was not properly adopted" through APA rulemaking. *Id.* at 328, 345, 821 S.E.2d at 200, 210. While the Retirement Systems Division's appeal to the appellate division was pending, the TSERS Board of Trustees engaged in rulemaking and established a cap factor of 4.5, the same value it had adopted during its 22 October 2015 meeting. *See* 20 N.C.A.C. 2B.0405. The rule adopting the cap factor became effective on 21 March 2019. *Id.*

Our Supreme Court subsequently affirmed this Court's decision, holding that the TSERS Board of Trustees "was required to adopt the statutorily mandated cap factor utilizing the rulemaking procedures required by the Administrative Procedure Act[.]" *Cabarrus Cnty. Bd. of Educ. v. Dep't of State Treasurer*, 374 N.C. 3, 25, 839 S.E.2d 814, 828 (2020). Shortly after the Supreme Court issued its decision, the General Assembly amended the APA to exempt the adoption of a contribution-based benefit cap factor from rulemaking. 2020 N.C. Sess. Law 48, sect. 4.1(c); N.C. Gen. Stat. § 150B-1(d)(30)(i) (2022).

## C. The Instant Litigation

Petitioner first hired Susan Bullock (the "employee") in 1985. The employee

had an average final compensation greater than $100,000 when she applied to retire effective 1 January 2018. After performing the calculations required by N.C. Gen. Stat. § 135-5(a3) and determining that Petitioner owed an additional contribution of $407,292.39 on behalf of the employee, the Retirement Systems Division sent Petitioner a notice of liability on 1 November 2017. Petitioner did not pay the additional contribution.

The Retirement Systems Division notified Petitioner on 21 May 2018 that it had recalculated the employee's pension based upon additional information and that Petitioner instead owed $401,763.96 on behalf of the employee. The Retirement Systems Division again notified Petitioner of the outstanding contribution on 8 March 2019. Petitioner sent a letter of appeal to the Retirement Systems Division on 6 May 2019, requesting that the notice of liability be withdrawn on the grounds that "the cap factor is unconstitutional" and the recently adopted cap factor rule was impermissibly retroactively applied to Petitioner. The Retirement Systems Division issued a final agency decision by letter dated 16 May 2019, concluding that "the assessment described in the March 8, 2019, letter is required by the laws governing TSERS, and will not be withdrawn."

Petitioner filed a petition for a contested case hearing in the Office of Administrative Hearings against the Retirement Systems Division and the TSERS Board of Trustees, alleging:

> [W]hen the invoice was sent to Petitioner here, the cap

factor was not yet valid and any attempt to collect monies under a nonexistent rule cannot be enforced. Even if the rule had been in effect, it would not legally apply to a contract entered into prior to the statute's being enacted, and a retirement that occurred prior to the rule's adoption.

Petitioner alleged the following in its Prehearing Statement:

Petitioner maintains that the rule cannot be applied to validate an invoice sent prior to the rule's effective date. Petitioner also maintains that the rule, effective March 21, 2019, cannot be applied to any retirement that occurred prior to the effective date of the rule. . . .

Finally, Petitioner Wilson County Schools contends that the rule, and the statute upon which it is based, are both in violation of State and federal constitutional provisions.

The parties filed competing motions for summary judgment on 30 August 2021. On 29 September 2021, the administrative law judge ("ALJ") issued a final decision, denying Petitioner's motion for summary judgment and granting Respondents' motion for summary judgment.

Petitioner filed a petition for judicial review in Wilson County Superior Court and added Tim Moore, North Carolina Speaker of the House, and Philip Berger, President Pro Tempore of the North Carolina Senate, as respondents. Petitioner alleged that the ALJ's final decision was erroneous because the Act is unconstitutional and impermissibly retroactive. Respondents moved to dismiss the petition for judicial review under Rules 12(b)(1), (2), and (6), asserting that the superior court lacked jurisdiction to hear constitutional challenges to the Act and seeking to dismiss the action against Speaker Moore and President Pro Tempore

Berger for failure to state a claim against them. The superior court denied the motion to dismiss by written order entered 18 March 2022.

After a hearing on 19 May 2022, the superior court entered an order on 13 June 2022 reversing the ALJ's grant of summary judgment in Respondents' favor and granting summary judgment in Petitioner's favor. The superior court concluded, in relevant part:

> 9. Where the Petition raised issues as to the constitutionality of NCGS 135-(5)(a)(3), this [c]ourt considered those arguments only 'as applied' to Petitioner, and not as facial constitutional challenges to the statute.
>
> . . . .
>
> 11. NCGS 135-(5)(a)(3), as applied to Petitioner on these facts, is an unconstitutional impairment of an existing contract in violation of Article I, Section 10 of the US Constitution, within the reasoning and ambit of the holding in Bailey v. State, 348 NC 130 (1998).
>
> 12. NCGS 135-(5)(a)(3), as applied to Petitioner on these facts, operates in violation of the common law prohibition against retroactive statutes and rules, within the reasoning and ambit of the holdings in Hicks v. Kearney, 189 NC 316 (1925) and Pinehurst v. Derby, 218 NC 653 (1940).
>
> 13. NCGS 135-(5)(a)(3), as applied to Petitioner on these facts, violates Article IX, Section 7(a) of the North Carolina Constitution, providing in part "all moneys, stocks, bonds, and other property belonging to a county school fund, and the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, *shall belong to and remain in the several counties,* and shall be faithfully appropriated and used exclusively for maintaining free public schools." (Emphasis added).
>
> 14. The Final Decision of the ALJ in this matter is in

violation of constitutional provisions and affected by errors of law.

Respondents timely appealed.

## II. Discussion

## A. Jurisdiction

Respondents first argue that the superior court lacked jurisdiction to hear Petitioner's constitutional challenges to the Act on a petition for judicial review. Petitioner insists that the superior court had jurisdiction to hear the constitutional issues. Following the precedent set by the North Carolina Supreme Court in *Meads v. N.C. Dep't of Agric.*, 349 N.C. 656, 509 S.E.2d 165 (1998), we hold that the trial court had jurisdiction to hear Petitioner's constitutional challenges.

Under N.C. Gen. Stat. § 150B-43,

> Any party or person aggrieved by the final decision in a contested case, and who has exhausted all administrative remedies made available to the party or person aggrieved by statute or agency rule, is entitled to judicial review of the decision under this Article, unless adequate procedure for judicial review is provided by another statute . . . .

N.C. Gen. Stat. § 150B-43 (2022). According to *Meads*,

> that statute sets forth five requirements that a party must satisfy before seeking review of an adverse administrative determination: "(1) the person must be aggrieved; (2) there must be a contested case; (3) there must be a final agency decision; (4) administrative remedies must be exhausted; and (5) no other adequate procedure for judicial review can be provided by another statute."

349 N.C. at 669, 509 S.E.2d at 174 (quoting *Huang v. N.C. State Univ.*, 107 N.C.

App. 710, 713, 421 S.E.2d 812, 814 (1992)).

Here, Petitioner satisfied all five requirements. First, Petitioner was aggrieved by the Retirement Systems Division's final agency decision concluding that "the [$401,763.96] assessment described in the March 8, 2019, letter is required by the laws governing TSERS, and will not be withdrawn." *See* N.C. Gen. Stat. § 150B-2(6) (2022) (defining "[p]erson aggrieved" as "[a]ny person or group of persons of common interest directly or indirectly affected substantially in his, her, or its person, property, or employment by an administrative decision"). Second, this is a contested case involving an administrative proceeding to resolve a dispute between the Retirement Systems Division and Petitioner regarding Petitioner's rights and duties under the Act. *See id.* § 150B-2(2) (defining "[c]ontested case" as "[a]n administrative proceeding pursuant to [the APA] to resolve a dispute between an agency and another person that involves the person's rights, duties, or privileges"). Furthermore, under the Supreme Court's analysis in *Meads*, the final three requirements are met because the ALJ's decision constituted a final agency decision which left Petitioner without an administrative remedy and no other adequate statutory procedure for judicial review. *See Meads*, 349 N.C. at 670, 509 S.E.2d at 174 (addressing the constitutionality of an administrative rule where the superior court addressed the constitutional challenge on a petition for judicial review from the Pesticide Board, an administrative agency subject to the APA); *see also In re Civil Penalty*, 92 N.C. App. 1, 7, 373 S.E.2d 572, 576 (1988) (reviewing the

constitutionality of a statute on a petition for judicial review where the trial court addressed it sua sponte), *rev'd on other grounds*, 324 N.C. 373, 379 S.E.2d 30 (1989); *see also, e.g., In re Redmond*, 369 N.C. 490, 497, 797 S.E.2d 275, 280 (2017) (holding that the Court of Appeals had jurisdiction to review the constitutionality of a statute on appeal from the Industrial Commission as "the first destination for the dispute in the General Court of Justice").

Respondents argue that a superior court has limited jurisdiction on a petition for judicial review and therefore may not determine the constitutionality of a statute. This argument, however, is contrary to well-settled law that the judiciary may determine the constitutionality of a statute, but an administrative board may not. *See Meads*, 349 N.C. at 670, 509 S.E.2d at 174; *Great Am. Ins. Co. v. Gold*, 254 N.C. 168, 173, 118 S.E.2d 792, 796 (1961). Because it is the province of the judiciary to determine constitutional issues, any effort made by Petitioner to have the constitutionality of the Act determined by the ALJ would have been unsuccessful. Accordingly, following *Meads*, as Petitioner satisfied the requirements under N.C. Gen. Stat. § 150B-43, Petitioner was entitled to judicial review of its constitutional challenges to the Act.

**B. Substantive Challenges to the Superior Court's Order**

Respondents argue that the superior court erred by concluding that the Act violates Article I, Section 10, of the United States Constitution and Article IX, Section 7(a), of the North Carolina Constitution. Respondents also argue that the

trial court erred by concluding that the statute was impermissibly retroactively applied to Petitioner.

### 1. *Standard of Review*

On a petition for judicial review, the superior court reviews de novo whether a final agency decision is "in violation of constitutional provisions" or "affected by other error of law[.]" N.C. Gen. Stat. §§ 150B-51(b), (c) (2022). Under de novo review, the court "considers the matter anew[] and freely substitutes its own judgment for the agency's." *Trayford v. N.C. Psychology Bd.*, 174 N.C. App. 118, 121, 619 S.E.2d 862, 864 (2005) (quotation marks and citation omitted). An appellate court reviewing a superior court's order regarding a final agency decision must determine whether the superior court exercised the appropriate scope of review and, if appropriate, determine whether the trial court did so properly. *EnvironmentaLEE v. N.C. Dep't of Env't & Nat. Res.*, 258 N.C. App. 590, 595, 813 S.E.2d 673, 677 (2018).

### 2. *Article I, Section 10, of the United States Constitution*

Respondents argue that the superior court erred by concluding that the Act "is an unconstitutional impairment of an existing contract in violation of Article I, Section 10 of the US Constitution[.]"

The Contract Clause states, in relevant part, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10. "[T]he Contract Clause limits the power of the States to modify their own contracts as well

as to regulate those between private parties." *United States Tr. Co. v. New Jersey*, 431 U.S. 1, 17 (1977) (citations omitted). "In determining whether a contractual right has been unconstitutionally impaired, we are guided by the three-part test set forth in *U.S. Trust*[.]" *Bailey v. State*, 348 N.C. 130, 140-41, 500 S.E.2d 54, 60 (1998). "The *U.S. Trust* test requires a court to ascertain: (1) whether a contractual obligation is present, (2) whether the state's actions impaired that contract, and (3) whether the impairment was reasonable and necessary to serve an important public purpose." *Id.* at 141, 500 S.E.2d at 60 (citation omitted).

Petitioner argues that "there were two contracts in existence that suffered impairment by the [Act]": the employment contract between Petitioner and the employee and "an implied contract" between Petitioner and the Retirement Systems Division.

### a. Alleged Contract between Petitioner and the Employee

There is no employment contract between Petitioner and the employee in the record. Nonetheless, even assuming such contract exists, there is no evidence in the record that the contract has been unconstitutionally impaired by the Act. "When examining whether a contract has been unconstitutionally impaired, the inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. . . . Minimal alteration of contractual obligations may end the inquiry at [this] stage." *Id.* at 151, 500 S.E.2d at 66 (quotation marks and citation omitted).

The record contains an affidavit from Dr. Lane Mills, Superintendent of Wilson County Schools. Mills averred that the employee was first employed by Petitioner in 1985 and served in various roles through 2013. Petitioner entered into an employment contract with the employee on 1 July 2013 to serve as Assistant Superintendent of Instructional Services for $130,000. The employee's salary was increased by 5% pursuant to an amendment to the contract in 2014. The employee retired effective 1 January 2018.

Aside from the $401,763.96 invoice, there is no record evidence of Petitioner's contributions to TSERS during the employee's approximately 33 years of employment. Thus, there is no record evidence that the additional contribution was significant in relation to Petitioner's contributions to TSERS during the employee's career. Furthermore, there is no record evidence showing how the employee's salary increase affected the outcome of the contribution-based benefit cap analysis. The employee's salary was increased by 5% pursuant to an amendment to her employment contract in 2014, but Mills' affidavit does not state when the salary increase became effective. If the employee's salary increase took effect after the Act was enacted on 30 July 2014 and resulted in the contribution-based benefit cap factor analysis concluding that an additional contribution was required, then the Act did not impair the employment contract. Accordingly, Petitioner has failed to establish that the Act substantially impaired its employment contract with the employee. As such, we need not analyze whether the impairment was reasonable

and necessary to serve an important public purpose.

### b. *Alleged Implied Contract between Petitioner and the Retirement Systems Division*

Petitioner argues that an implied contract "assumed that, in exchange for [Petitioner's] compliance with expected contributions on behalf of this [e]mployee, [Petitioner] had met its obligation under the law and there would not be a penalty down the road pursuant to legislation not in existence at the time [Petitioner] contracted to be bound for those contributions." However, Petitioner cites no authority to support its proposition that such an implied contract existed, or that it has a vested right in keeping constant its amount of contribution to the TSERS pension fund.

N.C. Gen. Stat. § 135-8(d)(1) provides that an employer is required to contribute "a certain percentage of the actual compensation of each member[,]" known as the "normal contribution," and "an additional amount equal to a percentage of the member's actual compensation[,]" known as the "accrued liability contribution." N.C. Gen. Stat. § 135-8(d)(1). By statute, the employer contribution rate fluctuates annually based upon an actuarial valuation, *see id.* § 135-8(d)(2a), and in recent years has steadily increased.[4] For an employee who became a

---

[4] The employer contribution rate has increased from 10.78% of compensation for the fiscal year ending 30 June 2018, 2017 N.C. Sess. Laws 57, sect. 35.19(b); to 12.29% in the fiscal year ending 30 June 2019, 2018 N.C. Sess. Laws 5, sect. 35.27; to 12.97% in the fiscal year ending 30 June 2020, 2019 N.C. Sess. Laws 209, sect. 3.15(b); to 14.78% in the fiscal year ending 30 June 2021, 2020

member of TSERS before 1 January 2015, the employee's last employer must make an additional contribution "to restore the member's retirement allowance to the pre cap amount." *Id.* §§ 135-5(a3), 135-8(f)(2)(f). There is no set rate that an employer must contribute, but rather it fluctuates to remedy gaps in the pension fund. Petitioner has therefore failed to show that the General Assembly manifested a clear intention to be contractually bound to keep constant the amount an employer is required to contribute to the pension fund. *See N.C. Ass'n of Educators v. State*, 368 N.C. 777, 786-87, 786 S.E.2d 255, 262-63 (2016). Accordingly, Petitioner has failed to show that a contractual obligation was present. As such, we need not analyze whether the Act impaired a contract or whether the impairment was reasonable and necessary to serve an important public purpose.

Accordingly, the superior court erred by concluding that the Act violated Article I, Section 10 of the United States Constitution.

### 3. *Article IX, Section 7(a), of the North Carolina Constitution*

Respondents argue that the superior court erred by concluding that the Act impaired the ability of Petitioner to provide a sound basic education, in violation of Article IX, Section 7(a), of the North Carolina Constitution.

Article IX, Section 7(a), of the North Carolina Constitution states:

---

N.C. Sess. Laws 41, sect. 1(a); to 16.38% in the fiscal year ending 30 June 2022, 2021 N.C. Sess. Laws 180, sect. 39.22(b); and to 17.38% for the fiscal year ending 30 June 2023, 2022 N.C. Sess. Laws 74, sect. 39.19.

> [A]ll moneys, stocks, bonds, and other property belonging to a county school fund . . . shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools.

N.C. Const. art. IX, § 7(a).

Petitioner has failed to present in its as-applied challenge any facts in the form of affidavits, testimony, or otherwise that the payment at issue in this case would undermine its ability to provide a sound basic education to Wilson County children. Furthermore, Petitioner has failed to show that paying its employees the deferred compensation to which they are entitled is not a use that maintains free public schools.

Accordingly, the superior court erred by concluding that the Act violates Article IX, Section 7(a), of the North Carolina Constitution.

### 4. Retroactivity

Respondents argue that the superior court erred by concluding that the Act "operates in violation of the common law prohibition against retroactive statutes and rules, within the reasoning and ambit of the holdings in Hicks v. Kearney, 189 NC 316 (1925) and Pinehurst v. Derby, 218 NC 653 (1940)" because the Act applies prospectively to this retirement.

In *Bank of Pinehurst v. Derby*, our Supreme Court set forth the general proposition that a statute must be construed as prospective unless it specifically states otherwise:

> There is always a presumption that statutes are intended

> to operate prospectively only, and words ought not to have a retrospective operation unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intention of the Legislature cannot be otherwise satisfied. Every reasonable doubt is resolved against a retroactive operation of a statute. If all of the language of a statute can be satisfied by giving it prospective action, only that construction will be given it. Especially will a statute be regarded as operating prospectively when it is in derogation of a common-law right, or the effect of giving it retroactive operations will be to destroy a vested right or to render the statute unconstitutional.

*Bank of Pinehurst v. Derby*, 218 N.C. 653, 658, 12 S.E.2d 260, 263-64 (1940) (quoting *Hicks v. Kearney*, 189 N.C. 316, 319, 127 S.E. 205, 207 (1925)).

Here, the Act provides that "every service retirement allowance . . . for members who retire on or after January 1, 2015, is subject to adjustment pursuant to a contribution-based benefit cap[.]" N.C. Gen. Stat. § 135-5(a3). The Act further provides that "the retirement allowance of a member who became a member before January 1, 2015 . . . shall not be reduced; however, the member's last employer . . . shall be required to make an additional contribution[.]" *Id.* The plain language of the Act indicates that it applies to any retirement allowance for a member who retires on or after 1 January 2015. Because the employee in this case retired on 1 January 2018, three years after Act took effect, the statute was not retroactively applied to Petitioner.

Petitioner argues that "the retroactivity of which Petitioner complains is the application of this statute and Rule to the rights that vested at the time these

parties entered into employment contracts." However, as discussed above, Petitioner does not have a vested right in keeping constant its contributions to the TSERS pension fund.

Because the employee in this case retired on 1 January 2018 and the Act applies to retirements that occur on or after 1 January 2015, the superior court erred by concluding that the Act was impermissibly retroactively applied to Petitioner.

## C. **Dismissal of Action against Speaker Moore and President Pro Tempore Berger**

Respondents argue that the superior court erred by denying their Rule 12(b)(6) motion to dismiss because Speaker Moore and President Pro Tempore Berger "are not proper parties to this administrative action[.]" (capitalization altered).

North Carolina Rule of Civil Procedure 19 states, "The Speaker of the House of Representatives and the President Pro Tempore of the Senate . . . must be joined as defendants in any civil action challenging the validity of a North Carolina statute or provision of the North Carolina Constitution under State or federal law." N.C. Gen. Stat. § 1A-1, R. 19(d) (2022). "There is a difference between a challenge to the facial validity of a statute as opposed to a challenge to the statute as applied to a specific party." *State v. Shackelford*, 264 N.C. App. 542, 550, 825 S.E.2d 689, 695 (2018) (brackets and citations omitted). "The basic distinction is that an as-applied

challenge represents a plaintiff's protest against how a statute was applied in the particular context in which plaintiff acted or proposed to act, while a facial challenge represents a plaintiff's contention that a statute is incapable of constitutional application in any context." *Id.* (citations omitted). "Only in as-applied challenges are facts surrounding the plaintiff's particular circumstances relevant." *Id.* (citations omitted).

Here, Petitioner acknowledges that, although it did not challenge the facial validity of the Act, it added Speaker Moore and President Pro Tempore Berger as parties to its petition for judicial review "in an abundance of caution." Although Petitioner asserted as-applied constitutional challenges in its petition for judicial review, this alone did not convert it into a "civil action challenging the validity of a North Carolina statute[.]" N.C. Gen. Stat. § 1A-1, R. 19(d); *see also M.E. v. T.J.*, 380 N.C. 539, 564, 869 S.E.2d 624, 640 (2022). Because Petitioner did not challenge the facial validity of a North Carolina statute, Speaker Moore and President Pro Tempore Berger were not proper parties to the petition for judicial review and the superior court therefore erred by denying Respondents' Rule 12(b)(6) motion to dismiss.

### III. Conclusion

We reverse the superior court's 13 June 2022 order reversing the ALJ's grant of summary judgment in Respondents' favor and granting summary judgment in Petitioner's favor because the Act does not violate Article I, Section 10, of the

United States Constitution; does not violate Article IX, Section 7(a), of the North Carolina Constitution; and is not retroactively applied to Petitioner. Furthermore, we reverse the superior court's 18 March 2022 order denying Respondents' Rule 12(b)(6) motion to dismiss because Speaker Moore and President Pro Tempore Berger were not proper parties to the petition for judicial review.

REVERSED.

Judges DILLON and HAMPSON concur.