McGEE, Chief Judge.
 

 *326
 
 I.
 
 Procedural History
 

 The Cabarrus County Board of Education ("Petitioner"), filed a "Request for Declaratory Ruling" pursuant to N.C. Gen. Stat. § 150B-4 (2017) and 20 N.C. Admin. Code 01F.0201
 
 et seq.
 
 on 18 October 2016. Pursuant to this filing, Petitioner requested the Retirement Systems Division (the "Division") of the Department of State Treasurer (the
 
 *199
 
 "Department") (along with State Treasurer at that time, Janet Cowell,
 
 [1]
 
 and Steven C. Toole, Director of the Division ("Director Toole"), in their official capacities, ("Respondents") ) to enter a declaratory ruling that the Division's adoption of a "cap factor" for the Teachers' and State Employees' Retirement System ("TSERS") pursuant to
 
 N.C. Gen. Stat. § 135-5
 
 (a3) (2017) was "void and of no effect because the [Board of Trustees of TSERS (the 'Board') ] did not follow the rule making procedures of ... the Administrative Procedure Act [ (the 'APA').]"
 
 [2]
 
 Director Toole denied Petitioner's request by letter dated 17 November 2016, and Petitioner filed a "Petition for Judicial Review" of Director Toole's decision in Superior Court, Cabarrus County, on 16 December 2016. Petitioner moved for summary judgment on 25 April 2017, the matter was heard on 10 May 2017, and the trial court granted summary judgment in favor of Petitioner by judgment entered 30 May 2017. Respondents appeal.
 
 *327
 
 II.
 
 Facts
 

 In 2014, the General Assembly enacted new legislation (the "Act"),
 
 [3]
 
 establishing a cap factor for certain employees covered by TSERS ("members").
 
 2014 N.C. Sess. Laws 88
 
 , sec. 1.(a). The purpose of the Act, in relevant part, was to "adopt a contribution-based benefit cap factor" (the "cap factor"), in order to limit retirement benefits paid by TSERS for certain members, whose State salaries had greatly increased in the latter years of their State employment, thereby significantly increasing their retirement benefits in disproportion to their overall contributions to TSERS.
 
 See
 
 N.C.G.S. § 135-5(a3).
 
 [4]
 

 Dr. Barry Shepherd ("Dr. Shepherd") was superintendent of Petitioner for a period of time until his retirement on 1 May 2015. Because of Dr. Shepherd's employment history with the State, he was eligible for TSERS retirement benefits, but was also subject to having his benefits capped pursuant to the provisions of the Act. Generally, once the Division determines that a member's benefits will be capped pursuant to the Act, the following actions are required:
 

 If a member's retirement allowance is subject to an adjustment pursuant to the contribution-based benefit cap established in G.S. 135-5(a3), the [Division] shall notify the member and the member's employer that the member's retirement allowance has been capped. The [Division] shall compute and notify the member and the member's employer of the total additional amount the member would need to contribute in order to make the member not subject to the contribution-based benefit cap. This total additional amount shall be the actuarial equivalent of a single life annuity adjusted for the age of the member at the time of retirement ... that would have had to have been purchased to increase the member's benefit to the pre-cap level. Except as otherwise provided in this subsection, the member shall have until 90 days after notification regarding this additional amount or until 90 days after the effective date of retirement, whichever is later, to submit a lump sum payment to the annuity savings fund in order for
 
 *328
 
 the retirement system to restore the retirement allowance to the uncapped amount.
 

 N.C. Gen. Stat. § 135-4
 
 (jj) (2015) ;
 
 [5]
 

 see also
 
 N.C.G.S. § 135-8(f)(2)(f). Upon Dr. Shepherd's
 
 *200
 
 retirement, the Division informed him and Petitioner that, pursuant to the Act, a contribution of $208,405.81 would be required to restore Dr. Shepherd's benefits to their pre-cap amount. Petitioner submitted this amount to the Division on behalf of Dr. Shepherd, but also initiated this action, as indicated above, to challenge the validity of the cap factor "adopted" by the Board and applied in this case to determine the $208,405.81 amount.
 

 Because the Division and the Board, as subdivisions of the Department, are subject to the contested case provisions of the APA, Petitioner requested a declaratory ruling from the Division that the cap factor as adopted by the Board was invalid for two reasons: (1) "because the [B]oard did not follow the rule making procedures of [the APA];" and (2) that because the cap factor "is not an actuarial assumption under 20 N.C. Admin. Code 02B.0202 [,]"
 
 [6]
 
 it was "not exempt from the rule making procedures of the APA[.]" Petitioner further asked for a ruling that the invoice sent by the Division for $208,405.81 was void since the cap factor used to calculate this amount had not been properly adopted pursuant to APA rule making requirements. As noted above, the Division denied Petitioner's requested rulings and Petitioner petitioned for judicial review, which ultimately resulted in the 30 May 2017 summary judgment in favor of Petitioner that is currently before us on appeal.
 

 We note that there are seven additional appeals by the Department-and certain of its subdivisions and employees-currently before us that involve identical issues and arguments. The resolution of this appeal will also determine the resolution of those seven additional appeals, because
 
 *329
 
 our holdings in this appeal will apply equally to the seven additional appeals.
 
 [7]
 
 Additional relevant facts will be included in our analysis below.
 

 III.
 
 Analysis
 

 Respondents argue that the trial court erred in granting summary judgment in favor of Petitioner, because the rule making provisions of the APA do not apply to N.C.G.S. § 135-5(a3) and, therefore, the Board acted within the law and its authority in adopting the cap factor outside of the APA rule making process. We disagree and affirm summary judgment.
 

 Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2017). " 'On appeal, this Court reviews an order granting summary judgment
 
 de novo
 
 .' "
 
 Manecke v. Kurtz
 
 ,
 
 222 N.C. App. 472
 
 , 475,
 
 731 S.E.2d 217
 
 , 220 (2012) (citations omitted). Findings of fact and conclusions of law are not required in an order granting summary judgment, and " '[i]f the granting of summary judgment can be sustained on any grounds, it should be affirmed on appeal. If the correct result has been reached, the judgment will not be disturbed even though the trial court may not have assigned the correct reason for the judgment entered.' "
 
 Save Our Schools of Bladen Cty. v. Bladen Cty. Bd. of Educ.
 
 ,
 
 140 N.C. App. 233
 
 , 237-38,
 
 535 S.E.2d 906
 
 , 910 (2000) (citation omitted). This Court is, however, limited to Respondents' arguments on appeal when considering whether to overturn the trial court's decision.
 
 [8]
 

 Ahmadi v. Triangle Rent A Car, Inc.
 
 ,
 
 203 N.C. App. 360
 
 , 363,
 
 691 S.E.2d 101
 
 , 103 (2010) (on appeal from grant of summary judgment, pursuant to N.C. R. App. P. 28(b)(6), arguments the appellant failed to make in its brief were considered
 
 *201
 
 abandoned and not considered by this Court).
 

 Respondents make two arguments in support of their position that the Board acted properly in the procedure it used to adopt the cap factor and, therefore, summary judgment in favor of Petitioner was granted in error: (1) "The legislature chose to have the cap factor adopted by resolution, not by rule[;]" and (2) "[t]he superior court erred by failing to give weight to the [Division's] interpretation of its enabling statute." We address each argument in turn.
 

 *330
 
 A.
 
 The General Assembly's Intent-Application of Rule Making
 

 The trial court found and concluded that "[t]he cap factor meets the [APA] definition of a rule in that it is a regulation or standard adopted by the Board ... to implement G.S. 135-5(a3). As such, the cap factor is subject to the rule making requirements of [the APA] unless otherwise exempted." Although findings of the trial court on summary judgment do not control our
 
 de novo
 
 review, we note that Respondents do not argue on appeal that the cap factor fails to meet the APA definition of a "rule." Instead, Respondents argue: "The General Assembly has distinguished functions that require rule[ ]making from functions that do not[,]" and further argue that determination of a cap factor by the Board is a "function" that the General Assembly intended to exempt, by implication, from the rule making provisions of the APA.
 

 1. Express Exemption
 

 As our courts have repeatedly noted:
 

 The purpose of the APA "is to establish as nearly as possible a uniform system of administrative rule making and adjudicatory procedures for State agencies," and the APA applies "to every agency as defined in G.S. 150B-2(1), except to the extent and in the particulars that any statute, including subsection (d) of this section, makes specific provisions to the contrary." N.C. Gen. Stat. § 150B-1(b), (c) (1989)..... As our Supreme Court has held, the "General Assembly intended only those agencies
 
 it expressly and unequivocally exempted from the provisions of the Administrative Procedure Act be excused in any way from the Act's requirements and, even in those instances, that the exemption apply only to the extent specified by the General Assembly.
 
 "
 
 Vass
 
 [
 
 v. Bd. of Trustees of State Employees' Medical Plan
 
 ,
 
 324 N.C. 402
 
 , 407,
 
 379 S.E.2d 26
 
 , 29 (1989) ].
 

 North Buncombe Assn. of Concerned Citizens v. Rhodes
 
 ,
 
 100 N.C. App. 24
 
 , 28,
 
 394 S.E.2d 462
 
 , 465 (1990) (emphasis added).
 

 There is no dispute that the Division, as a sub-agency of the Department, is subject to the APA. The "Policy and scope" section of the APA states its purpose: "This Chapter establishes a uniform system of administrative rule making and adjudicatory procedures for agencies. The procedures ensure that the functions of rule making, investigation, advocacy, and adjudication are not all performed by the same
 
 *331
 
 person in the administrative process." N.C.G.S. § 150B-1(a). Some agencies or sub-agencies are
 
 completely
 
 exempted from the APA by N.C.G.S. § 150B-1(c) : "Full Exemptions[,]" "[t]his Chapter applies to every agency except" those specifically exempted by direct reference. N.C.G.S. §§ 150B-1(c)(1) through (7). Neither the Department, nor any of its subdivisions, are granted total exemption from the provisions of the APA.
 

 Id.
 

 N.C.G.S. § 150B-1(d) -"Exemptions from Rule Making"-states: "Article 2A of this Chapter does not apply to the following" enumerated agencies or subdivisions thereof.
 
 [9]
 
 N.C.G.S. §§ 150B-1(d)(1) through (28). Neither the Department, nor any of its subdivisions, are exempted from the rule making provisions of the APA pursuant to N.C.G.S. § 150B-1(d). Article 2A includes nothing that indicates any legislative intent to exempt the Board from the rule making process for any purpose. Further, no part of N.C.G.S. § 135-5(a3), or N.C.G.S. § 135-5 as a whole, references the APA-much less includes any express language exempting its provisions from the rule making procedures of Article 2A.
 

 As noted above, N.C.G.S. § 135-5(a3) is found in Article 1, "Retirement System for
 
 *202
 
 Teachers and State Employees," of Chapter 135. N.C.G.S. §§ 135-1 through 135-18.11. Pursuant to Article 1: "A Retirement System is hereby established and placed under the management of the Board ... for the purpose of providing retirement allowances and other benefits under the provisions of this Chapter for teachers and State employees of the State of North Carolina." N.C.G.S. § 135-2. "[A]ll contributions from participating employers and participating employees to this Retirement System shall be made to
 
 funds
 
 held in trust" by the Division. N.C.G.S. § 135-2 (emphasis added). N.C.G.S. § 135-6 concerns the "Administration" of the Retirement System. It establishes that the Board is responsible for the "general administration and responsibility for the proper operation of the Retirement System and for making effective the provisions of the Chapter[.]" N.C.G.S. § 135-6(a). Other duties required of the Board include:
 

 Rules and Regulations
 
 .-Subject to the limitations of this Chapter, the Board ... shall, from time to time,
 
 establish rules and regulations
 
 for the administration of
 
 the funds
 
 created by this Chapter and for the transaction of its business. The Board ... shall also, from time to time, in its discretion, adopt rules and regulations to prevent injustices and inequalities which might otherwise arise in the administration of this Chapter.
 

 *332
 
 N.C.G.S. § 135-6(f). There is no dispute that the rule making provisions of the APA apply to the Board when it "establish[es] rules and regulations for the administration of the funds created by" Chapter 135-including "all contributions from participating employers and participating employees ... made to funds held in trust" by the Division.
 
 Id
 
 .; N.C.G.S. § 135-2.
 

 The portion of N.C.G.S. § 135-5(a3) relevant to Respondents' arguments states:
 

 Anti-Pension-Spiking Contribution-Based Benefit
 

 Cap
 
 .-Notwithstanding any other provision of this section, every service retirement allowance provided under this section for members who retire on or after January 1, 2015, is subject to adjustment pursuant to a contribution-based benefit cap under this subsection.
 
 The Board ... shall adopt a contribution-based benefit cap factor recommended by the actuary, based upon actual experience, such that no more than three-quarters of one percent (0.75%) of retirement allowances are expected to be capped.
 
 The Board ... shall modify such factors every five years, as shall be deemed necessary, based upon the five-year experience study as required by G.S. 135-6(n).
 

 N.C.G.S. § 135-5(a3) (emphasis added). All "retirement allowances" are paid from funds held in trust, which are maintained in solvency by contributions from participating employers and employees (or "members"). N.C.G.S. § 135-2. Absent clear contrary direction from the General Assembly, management of the funds from which retirement allowances are disbursed must be accomplished pursuant to rules adopted pursuant to the rule making provisions of the APA. N.C.G.S. § 135-6(f) ; N.C.G.S. § 150B-1(a) ;
 
 Rhodes
 
 ,
 
 100 N.C. App. at 28
 
 ,
 
 394 S.E.2d at 465
 
 .
 

 The most clear and direct means available to the General Assembly whereby it could have expressed its intent to exclude the Board's adoption of a cap factor from rule making procedures was to include an express exemption in either the APA, N.C.G.S. § 135-5(a3), or some other relevant statute. The General Assembly did not make this choice, and enacted N.C.G.S. § 135-5(a3) without any associated statutory exemptions from the rule making provisions of the APA with respect to adoption of the cap factor, or for any other of the Board's duties. This, despite the fact that the General Assembly has done so for specific tasks of other agencies.
 
 See, e.g.
 
 , N.C.G.S. § 150B-1(d)(7) (specifically exempting "The State Health Plan for Teachers and State Employees in administering the provisions of Article 3B of
 
 *333
 
 Chapter 135 of the General Statutes" from APA rule making requirements); N.C.G.S. § 150B-2(8a)(j.) ("The term ['rule'] does not include" "[e]stablishment of the interest rate that applies to tax assessments under G.S. 105-241.21."). According to the reasoning in
 
 Vass
 
 and
 
 Rhodes
 
 , the rule making provisions of the APA should apply whenever the Board adopts a "rule," because the General Assembly
 
 *203
 
 has not expressly exempted the Board from the rule making provisions of the APA.
 
 Rhodes
 
 ,
 
 100 N.C. App. at 28
 
 ,
 
 394 S.E.2d at 465
 
 .
 
 [10]
 

 2. Exemption by Implication
 

 However, as Respondents have noted, this Court, and our Supreme Court, have held that exemption from the APA can be recognized by
 
 implication
 
 rather than express language in certain limited circumstances.
 
 See
 

 Bring v. N.C. State Bar
 
 ,
 
 348 N.C. 655
 
 ,
 
 501 S.E.2d 907
 
 (1998) ;
 
 N.C. State Bar v. Rogers
 
 ,
 
 164 N.C. App. 648
 
 ,
 
 596 S.E.2d 337
 
 (2004) (recognizing, in turn, that by creating express statutory procedures, for rule making and hearing of contested cases, different from those of the APA, the General Assembly intended the North Carolina State Bar (the "State Bar") to operate outside APA requirements). Respondents have directed this Court to no agency or sub-agency, other than the State Bar, that has been determined to have been exempted from the APA by
 
 implication
 
 , and we have found none.
 

 Nonetheless, Respondents compare the wording used in N.C.G.S. § 135-5(a3) to wording used in other parts of Article 1, contending: "This case turns on a particular feature of statutory language: the use of the word 'rule' in some places but not in others." Respondents' argument is that the General Assembly's intent to exclude adoption of the cap factor from APA rule making is evident once we apply the maxim
 
 expressio unius est exclusio alterius
 
 , because the General Assembly used the word "rule" in some parts of Article 1, but not in others, and thereby indicated a clear intent that APA rule making only applies when the actual word "rule" is used. We resort to rules of statutory interpretation only if the meaning of some portion of the relevant statute is legally ambiguous. Assuming,
 
 arguendo
 
 , that the challenged language of N.C.G.S. § 135-5(a3) is ambiguous, Respondents' argument still fails.
 

 Our Supreme Court has rejected an
 
 expressio unius est exclusio alterius
 
 argument in similar circumstances.
 
 Empire Power Co. v. N.C. Dept. of E.H.N.R.
 
 ,
 
 337 N.C. 569
 
 , 592-93,
 
 447 S.E.2d 768
 
 , 782 (1994) (citation and parentheses omitted) ("[The relevant organic] statute
 
 *334
 
 makes no provision for petitioner to commence a contested case hearing, nor does it expressly deny him that right. Respondents, however, would have us apply to it the maxim
 
 expressio unius est exclusio alterius
 
 , mention of specific circumstances
 
 implies
 
 the exclusion of others, and conclude that the legislature intended, albeit by implication, to exclude persons aggrieved, other than the permit applicant or permittee, from those entitled to a contested case hearing under the [ ]APA."). The Court in
 
 Empire Power
 
 held that the organic statute, N.C.G.S. § 143-215.108(e), had to be interpreted
 
 together with
 
 the relevant provisions of the APA:
 

 N.C.G.S. § 143-215.108(e) and N.C.G.S. § 150B-23, however, are
 
 in pari materia
 
 , and we must give effect to both if possible. Respondents basically contend that the organic statute amends, repeals, or makes exception to the [ ]APA
 
 by implication
 
 . "The presumption is always against an intention to [amend or] repeal an earlier statute." We thus should not construe the silence of N.C.G.S. § 143-215.108(e) ... as a repeal of any ... rights expressly conferred upon [the petitioner] under the [ ]APA. The legislature has not expressed or otherwise made manifestly clear an intent to deprive petitioner of any right ... he might have by virtue of the [ ]APA; moreover, there is not such repugnancy between the statutes as to create an implication of amendment or repeal "to which we can consistently give effect under the rules of construction of statutes."
 

 Id.
 
 at 593,
 
 447 S.E.2d at 782
 
 (citations omitted). The Court explained that if there is "a fair and reasonable construction of the organic statute that harmonizes it with the provisions of the [ ]APA, ... it is our duty to adopt that construction.
 
 Id
 
 . (citation omitted). The Court further reasoned:
 

 "Ordinarily, ... the enactment of a law will not be held to have changed a statute
 
 *204
 
 that the legislature did not have under consideration at the time of enacting such law; and implied amendments cannot arise merely out of supposed legislative intent in no way expressed, however necessary or proper it may seem to be.
 
 An intent to amend a statute will not be imputed to the legislature unless such intention is manifestly clear from the context of the legislation; and an amendment by implication, or a modification of, or exception to, existing law by a later act, can occur only where the
 

 *335
 

 terms of a later statute are so repugnant to an earlier statute that they cannot stand together.
 
 "
 

 The [ ]APA entitles petitioner to an administrative hearing; the organic statute, respondents contend, denies him that right. The question thus is whether the legislature intended, in enacting the air pollution control administrative review provisions, to deprive petitioner of the right it expressly conferred upon him in the [ ]APA. Applying the foregoing rules of statutory construction, we conclude that because the organic statute
 
 did not expressly provide otherwise
 
 , the legislature did not intend to deprive petitioner of his right to an administrative hearing.
 

 Empire Power
 
 ,
 
 337 N.C. at 591-92
 
 ,
 
 447 S.E.2d at 781-82
 
 (citations and footnote omitted) (some emphasis added). The Court concluded: "Considering the unequivocal 'language of the statute [the [ ]APA], the spirit of the act, and what the act seeks to accomplish,' we conclude that the legislature intended that the [ ]APA should control unless the organic statute
 
 expressly
 
 provides otherwise."
 
 Id
 
 . at 594-95,
 
 447 S.E.2d at 783
 
 (citations omitted). The Court thus held that, because the organic statute involved in
 
 Empire Power
 
 did not
 
 expressly
 
 amend the APA to withdraw the petitioner's right of appeal pursuant to the APA and, because there was not "
 
 such repugnancy between the statutes as to create an implication of amendment or repeal
 
 'to which we can consistently give effect under the rules of construction of statutes[,]' " the provisions of the APA controlled.
 
 Id
 
 . at 593,
 
 447 S.E.2d at 782
 
 (citation omitted) (emphasis added);
 
 see also
 

 Id.
 
 at 595,
 
 447 S.E.2d at 783-84
 
 (plenary citations in accord).
 

 Respondents cite
 
 Bring
 
 and
 
 Rogers
 
 in support of their argument that the General Assembly expressed a clear intention to remove adoption of the cap factor from APA rule making requirements by omitting the word "rule" from the relevant language of N.C.G.S. § 135-5(a3).
 
 Bring
 
 and
 
 Rogers
 
 do both recognize an "exemption" from provisions of the APA of an agency-the State Bar-by implication rather than specific exemption.
 
 Rogers
 
 involved an appeal from the suspension of an attorney's ("Rogers") license to practice law.
 
 Rogers
 
 ,
 
 164 N.C. App. 648
 
 ,
 
 596 S.E.2d 337
 
 . Rogers argued in part that "he should have had a hearing before an administrative law judge under the [APA]" instead of being forced to conduct his hearing before the Disciplinary Hearing Commission of the State Bar (the "DHC").
 
 Id.
 
 at 652-53,
 
 596 S.E.2d at 341
 
 . This Court rejected Rogers' "contention that he should be entitled
 
 *336
 
 to a hearing before an administrative law judge under the APA."
 
 Id.
 
 at 654,
 
 596 S.E.2d at 341
 
 . In addressing Rogers' argument, this Court stated:
 

 The APA is a statute of general applicability, and does not apply where the Legislature has provided for a more specific administrative procedure to govern a state agency.
 
 See
 

 Empire Power Co. v. N.C. Dept. of E.H.N.R.
 
 ,
 
 337 N.C. 569
 
 , 586-87,
 
 447 S.E.2d 768
 
 , 778-79 (1994). The Legislature has
 
 expressly and specifically given
 
 the State Bar Council and DHC the power to regulate and handle disciplinary proceedings of the State Bar.
 
 See
 

 N.C. Gen. Stat. § 84-28
 
 (2003) (powers of the State Bar Council to discipline attorneys);
 
 N.C. Gen. Stat. § 84-28.1
 
 (disciplinary hearing commission powers). As such, defendant is not entitled to application of the APA to his State Bar disciplinary proceeding in this case.
 

 Id.
 

 (emphasis added). Although in
 
 Rogers
 
 this Court did not make an explicit holding that the organic statutes involved-
 
 N.C. Gen. Stat. § 84-15
 

 et seq.
 
 (2017)-expressly amended the APA, we determined, by examining the organic statutes themselves, that the clear intent of the General Assembly was
 
 *205
 
 to exempt the DHC from APA contested case provisions.
 
 See
 

 Id.
 

 ;
 
 Empire Power
 
 ,
 
 337 N.C. at 593
 
 ,
 
 447 S.E.2d at 782
 
 . The clear implication is that this Court based its determination on reasoning that, by creating an entirely independent procedure and reviewing authority within the State Bar, with authority to identify, investigate, prosecute, and rule upon alleged violations, the "the terms of [the] later [organic] statute [we]re so repugnant to [the APA] that they [could not] stand together"
 
 [11]
 
 and, therefore, the General Assembly intended to exempt DHC disciplinary proceedings from APA contested case procedures:
 

 The Legislature has expressly and specifically given the State Bar Council and DHC the power to regulate and handle disciplinary proceedings of the State Bar.
 
 See
 

 N.C. Gen. Stat. § 84-28
 
 (2003) (powers of the State Bar Council to discipline attorneys);
 
 N.C. Gen. Stat. § 84-28.1
 
 (disciplinary hearing commission powers). As such, defendant is not entitled to application of the APA to his State Bar disciplinary proceeding in this case.
 

 Rogers
 
 ,
 
 164 N.C. App. at 654
 
 ,
 
 596 S.E.2d at 341
 
 .
 

 *337
 
 In essence, this Court recognized that the General Assembly enacted a distinct, thorough, complete, and self-contained disciplinary process by which the State Bar-through the DHC-was mandated to initiate and pursue investigations and hearings as required to police and regulate attorney conduct. This process includes procedural rules-such as a right of direct appeal from any final order of the DHC to this Court.
 
 See
 
 N.C.G.S. § 84-21 ("(a) The Council shall adopt the rules pursuant to G.S. 45A-9." "(b) .... Copies of all rules and regulations and of all amendments adopted by the Council shall be certified to the Chief Justice of the Supreme Court of North Carolina ....: Provided, that the [C]ourt may decline to have so entered upon its minutes any rules, regulations and amendments which in the opinion of the Chief Justice are inconsistent with this Article.");
 
 see also, e.g.
 
 , N.C.G.S. § 84-23 ; N.C.G.S. § 84-28 ; N.C.G.S. § 84-28.1. Therefore, the organic statute left no room for application of APA procedures, and this Court held APA contested case provisions did not apply.
 

 Bring
 
 is fully consistent with our analysis of
 
 Empire Power
 
 and
 
 Rogers
 
 . We first note in general: "When a dispute between a state agency and another person arises and cannot be settled informally, the procedures for resolving the dispute are governed by the Administrative Procedure Act (APA), N.C. Gen. Stat. §§ 150B-1 to -63."
 
 Rhodes
 
 ,
 
 100 N.C. App. at 28
 
 ,
 
 394 S.E.2d at 465
 
 (citation omitted). In
 
 Bring
 
 , our Supreme Court held that the General Assembly clearly intended the State Bar to adopt rules without resort to APA rule making provisions:
 

 It was not necessary to adopt the rule in accordance with the requirements of the APA.
 
 N.C.G.S. § 84-21 gives specific directions as to how the Board shall adopt rules. These directions must govern over the general rule-making provision of the APA
 
 . We note that, in her appeal, the petitioner followed N.C.G.S. § 84-24 dealing with appeals of decisions of the Board of Law Examiners and not the provisions of the APA.
 

 The Board's rules, including Rule .0702, were submitted to this Court as required by N.C.G.S. § 84-21 and published at volume 326, page 810 of the North Carolina Reports. This complies with the statutory requirement. Rule .0702 was properly adopted.
 

 Bring
 
 ,
 
 348 N.C. at 660
 
 ,
 
 501 S.E.2d at 910
 
 (citation omitted) (emphasis added). The organic statute at issue in
 
 Bring
 
 ,
 
 N.C. Gen. Stat. § 84-21
 
 (2017), established a rule making procedure completely independent
 
 *338
 
 from that contained in the APA. Therefore, the General Assembly's intent was clear that the specific rule making provisions enacted for proceedings governed by the State Bar controlled, not those contained in the APA. The Court held "there are adequate procedural safeguards in the statute to assure adherence to the legislative standards" and noted that " N.C.G.S. § 84-24 and N.C.G.S. § 84-21 require that the Bar Council and this Court must approve rules made by the Board."
 
 *206
 

 Id.
 

 at 659
 
 ,
 
 501 S.E.2d at 910
 
 . The Court further held that there was "a sufficient standard to guide the Board" in rule making pursuant to Article 4, Chapter 84.
 

 Id.
 

 Article 1 includes nothing approaching the level of independent rule making mandated by the General Assembly for the State Bar in Article 4, Chapter 84. We note that Respondents have utilized the procedures of the APA throughout this action without objection, including obtaining appeal to this Court pursuant to the right of appeal granted by the APA. N.C.G.S. § 150B-52.
 

 Additionally, when read together,
 
 Rogers
 
 and
 
 Bring
 
 effectively hold that the APA simply does not apply to Article 4, Chapter 84. N.C.G.S. § 150B-1(a) (emphasis added) ("
 
 Purpose
 
 .-This Chapter [the APA] establishes a uniform system of administrative
 
 rule making
 
 and
 
 adjudicatory procedures
 
 for agencies.");
 
 Bring
 
 ,
 
 348 N.C. at 660
 
 ,
 
 501 S.E.2d at 910
 
 (APA rule making provisions do not apply to the State Bar);
 
 Rogers
 
 ,
 
 164 N.C. App. at 654
 
 ,
 
 596 S.E.2d at 341
 
 (APA adjudicatory procedures do not apply to the State Bar). In contrast, Article 1 expressly recognizes the general application of the APA.
 
 See, e.g.,
 
 N.C.G.S. § 135-8(d)(3a) ("Notwithstanding Chapter 150B of the General Statutes [the APA], the total amount payable in each year to the pension accumulation fund shall not be less than ...."). Respondents make an argument very different than the analyses behind the holdings in
 
 Bring
 
 and
 
 Rogers
 
 , which served to exempt the
 
 entire
 
 State Bar from the requirements of the APA. Respondents contend that the application of APA rule making should be determined
 
 on a line-by-line basis
 
 , based upon the
 
 implied intent
 
 of the General Assembly, as determined by analyzing each individual sentence or clause of a statutory provision. Respondents cite to no authority in support of this argument, neither
 
 Bring
 
 nor
 
 Rogers
 
 support Respondents' argument, and the other opinions cited by Respondents do not involve the APA and are, therefore, easily distinguishable.
 

 Respondents also focus on the requirement that the cap factor adopted by the Board is one "recommended by the actuary." N.C.G.S. § 135-5(a3). However, the inclusion of a specific requirement concerning the
 
 source
 
 of the proposed cap factor in no manner serves to remove the entire cap factor adoption process from general APA requirements. As
 
 *339
 
 part of its administration of Retirement System funds, the Board "shall keep in convenient form such data as shall be necessary for actuarial valuation of the various funds of the Retirement System, and for checking the experience of the System." N.C.G.S. § 135-6(h). The Board is required to "designate an actuary who shall be the technical adviser of the Board ... on matters regarding the operation of the funds created by the provisions of this Chapter[.]" N.C.G.S. § 135-6(l). Respondents contend that N.C.G.S. § 135-6(l) establishes "a specific procedure for how the [Board] adopts actuarial recommendations" from the designated actuary. N.C.G.S. § 135-6(l) states in relevant part:
 

 For purposes of the annual valuation of System assets, the experience studies, and all other actuarial calculations required by this Chapter, all the assumptions used by the System's actuary, including mortality tables, interest rates, annuity factors, and employer contribution rates, shall be set out in the actuary's periodic reports or other materials provided to the Board[.] These materials, once accepted by the Board, shall be considered part of the Plan documentation governing this Retirement System; similarly, the Board's minutes relative to all actuarial assumptions used by the System shall also be considered part of the Plan documentation governing this Retirement System, with the result of precluding any employer discretion in the determination of benefits payable hereunder[.]
 

 N.C.G.S. § 135-6(l). Respondents contend that the above "statutory procedures vary significantly from the requirements of the APA[, s]
 
 ee
 
 [N.C.G.S.] §§ 150B-21.1 to 21.7," because of the requirement that the Board adopt a cap factor from cap factor recommendations provided by its actuary.
 

 Sections 150B-21.1 to 21.7 of the APA constitute the "Adoption of Rules" section of the APA. Non-exempted agencies must comply with the provisions of N.C.G.S. § 150B-19.1,
 
 *207
 

 see
 
 N.C.G.S. § 150B-21.2(a), which include in relevant part:
 

 (a) In developing and drafting rules for adoption in accordance with this Article, agencies shall adhere to the following principles:
 

 ....
 

 (5) When appropriate,
 
 rules shall be based on sound, reasonably available scientific, technical,
 

 *340
 

 economic, and other relevant information
 
 . Agencies shall include a reference to this information in the notice of text required by G.S. 150B-21.2(c).
 

 N.C.G.S. § 150B-19.1 (emphasis added); N.C.G.S. § 150B-21.2(a) ("[b]efore an agency adopts a permanent rule, the agency must comply with the requirements of G.S. 150B-19.1"); N.C.G.S. § 150B-21.2(c)(2a) (the "notice of the proposed text of a rule must include" a "link to the agency's Web site containing the information required by G.S. 150B-19.1(c)"); N.C.G.S. § 150B-19.1(c)(5) (the posting required by N.C.G.S. § 150B-21.2(c)(2a) shall include "[a]ny fiscal note that has been prepared for the proposed rule"); N.C.G.S. § 150B-19.1(e) (before submitting "a proposed rule for publication in accordance with G.S. 150B-21.2, the agency shall review the details of any fiscal note prepared in connection with the proposed rule and approve the fiscal note before submission"); N.C.G.S. § 150B-19.1(f) (emphasis added) ("[i]f the agency determines that a proposed rule will have a substantial economic impact as defined in G.S. 150B-21.4(b1), the agency
 
 shall consider at least two alternatives
 
 to the proposed rule"); N.C.G.S. § 150B-21.4(b1) (when an agency proposes adoption of a rule "that would have a substantial economic impact and that is not identical to a federal regulation that the agency is required to adopt, the agency shall prepare a fiscal note for the proposed rule change and have the note approved by the Office of State Budget and Management[,]" "the term 'substantial economic impact' means an aggregate financial impact on all persons affected of at least one million dollars ($1,000,000) in a 12-month period"). The APA regularly requires supporting documentation based on factual data that is prepared by an actuary-including prior to the adoption of certain rules. As a further example:
 

 Before an agency publishes in the North Carolina Register the proposed text of a permanent rule change that would require the expenditure or distribution of
 
 funds
 
 subject to the State Budget Act, Chapter 143C of the General Statutes,
 
 [
 

 12
 

 ]
 
 it must submit the text of the proposed rule change, an analysis of the proposed rule change, and a fiscal note on the proposed rule change to the Office of State Budget and Management and obtain certification from the
 
 *341
 
 Office of State Budget and Management that the funds that would be required by the proposed rule change are available. The fiscal note must state the amount of funds that would be expended or distributed as a result of the proposed rule change
 
 and explain how the amount was computed.
 
 The Office of State Budget and Management must certify a proposed rule change if funds are available to cover the expenditure or distribution required by the proposed rule change.
 

 N.C.G.S. § 150B-21.4(a) (emphasis added).
 

 Contrary to Respondents' arguments, what N.C.G.S. § 135-6(l) requires is that "the assumptions used by the [Division's] actuary [to determine cap factor recommendations], including mortality tables, interest rates, annuity factors, and employer contribution rates," "shall be set out in the actuary's periodic reports or other materials provided to the Board[.]" The requirement that the actuary submit proposed cap factors to the Board for adoption does not constitute a separate procedure for rule making purposes. This requirement merely insures that the cap factor adopted by the Board is based upon professionally determined assumptions
 
 *208
 
 and projections, and that there will be sufficient documentation to satisfy the requirements of Chapter 135, the APA,
 
 [13]
 
 and the State Budget Act- N.C. Gen. Stat. §§ 143C-1-1
 
 et seq
 
 . (2017).
 

 Further, we presume the General Assembly enacted Article 1 with full knowledge of the relevant provisions in the APA, and intended for those provisions to apply to Article 1 absent express legislation to the contrary-which they declined to enact.
 
 Rhyne v. K-Mart Corp.
 
 ,
 
 358 N.C. 160
 
 , 189,
 
 594 S.E.2d 1
 
 , 20 (2004) (citations omitted) (we presume " 'the legislature acted in accordance with reason and common sense,' and 'with full knowledge of prior and existing law' "). We hold that there is nothing to support a finding that " 'the terms of [ N.C.G.S. § 135-8(3a) ] are so repugnant to' " the rule making requirements of the APA such that the General Assembly intended to remove adoption of the cap factor from APA rule making requirements by implication.
 
 Empire Power
 
 ,
 
 337 N.C. at 591
 
 ,
 
 447 S.E.2d at 781
 
 (citations omitted) (emphasis removed).
 

 3. Statutory Language
 

 In further support of our decision, we look to the language of the relevant statutes when considered
 
 in pari materia
 
 . Because the Division
 
 *342
 
 is subject to the APA and the procedures of the APA apply to Petitioner's "action," the definitions found in N.C.G.S. § 150B-2 apply to N.C.G.S. § 135-5(a3) unless specifically supplanted by definitions included in Article 1.
 
 See
 

 Izydore v. City of Durham
 
 ,
 
 228 N.C. App. 397
 
 , 399-401,
 
 746 S.E.2d 324
 
 , 325-26 (2013).
 

 The definitions section of Article 1, N.C.G.S. § 135-1, does not define the word "adopt." However, the word "adopt" is defined in the APA: " 'Adopt' means to take final action to create, amend, or repeal
 
 a rule
 
 ." N.C.G.S. § 150B-2(1b) (emphasis added). We hold that the word "adopt" in N.C.G.S. § 135-5(a3) has the same meaning as that set forth in N.C.G.S. § 150B-2(1b). Further, Article 1 contains no definition for the word "rule." The APA defines "rule" as follows:
 

 "Rule" means
 
 any
 
 agency regulation, standard, or statement of general applicability that
 
 implements
 
 or interprets
 
 an enactment of the General Assembly
 
 ... or that describes the procedure or practice requirements of an agency. The term includes the establishment of a fee
 
 and the amendment or repeal of a prior rule
 
 .
 

 N.C.G.S. § 150B-2(8a) (emphasis added). The General Assembly has included certain specific exceptions for regulations or standards that would otherwise fall under the definition of rule, for example, the "[e]stablishment of the interest rate that applies to tax assessments under G.S. 105-241.21" is expressly excluded from the APA definition of "rule." N.C.G.S. § 150B-2(8a)(j.). The APA includes no exemption for the N.C.G.S. § 135-5(a3) "cap factor." " 'Policy' means any nonbinding interpretive statement within the delegated authority of an agency that merely defines, interprets, or explains the meaning of a statute or rule." N.C.G.S. § 150B-2(7a). The cap factor is clearly not a "policy" as defined by the APA, as it is binding and non-interpretive. We agree with the trial court and hold that the cap factor falls within the APA definition of a "rule."
 

 Further, pursuant to the APA definition of "adopt," any time the word "adopt" is used, it expressly and necessarily
 
 requires an associated rule
 
 . N.C.G.S. § 150B-2(1b) (emphasis added) (" 'Adopt' means to take final action to create, amend, or repeal
 
 a rule
 
 ."). Pursuant to the APA definition of adopt, the
 
 only
 
 thing that the Board in N.C.G.S. § 135-5(a3) could have possibly "adopted" was a "rule." N.C.G.S. § 150B-2(1b). Therefore, treating the cap factor as a "rule," the contested portion of N.C.G.S. § 135-5(a3) can be understood as stating:
 

 The Board ... shall adopt a [
 
 rule
 
 , namely a] contribution-based benefit cap factor recommended by the actuary,
 
 *343
 
 based upon actual experience, such that no more than three-quarters of one percent (0.75%) of retirement allowances are expected to be capped. The Board ... shall modify such [rules] every five years, as shall be deemed
 
 *209
 
 necessary, based upon the five-year experience study as required by G.S. 135-6(n).
 

 The language of N.C.G.S. § 135-5(a3), considered
 
 in pari materia
 
 with the APA, does not support a finding that the General Assembly, by enacting N.C.G.S. § 135-5(a3), intended to modify or amend the APA by implication.
 

 B.
 
 Deference to the Board's Interpretation of N.C.G.S. § 135-5(a3)
 

 Respondents further argue that the trial court "erred by failing to give weight to the [Division's] interpretation of its enabling statute." We disagree.
 

 Initially, our review on summary judgment is
 
 de novo
 
 , and we will uphold a grant of summary judgment upon any legitimate basis.
 
 Manecke
 
 ,
 
 222 N.C. App. at 475
 
 ,
 
 731 S.E.2d at
 
 220 ;
 
 Save Our Schools
 
 ,
 
 140 N.C. App. at 237-38
 
 ,
 
 535 S.E.2d at 910
 
 . Therefore, even assuming,
 
 arguendo
 
 , the trial court failed to give proper deference to the Division's interpretations of Article 1 and the Division's rule making powers, this fact would be irrelevant to our
 
 de novo
 
 review.
 

 Id.
 

 Concerning Respondents' arguments, we first note that, despite the deference we may give an agency's interpretation of statutes that agency is required to implement and enforce, "it is ultimately the duty of courts to construe administrative statutes; courts cannot defer that responsibility to the agency charged with administering those statutes."
 
 Wells v. Consolidated Jud'l Ret. Sys. of N.C.
 
 ,
 
 354 N.C. 313
 
 , 319,
 
 553 S.E.2d 877
 
 , 881 (2001) (citing
 
 State ex rel. Utilities Commission v. Public Staff
 
 ,
 
 309 N.C. 195
 
 ,
 
 306 S.E.2d 435
 
 (1983) ). Respondents argue: "Since 1981, the [Division] has held that the [Board] will adopt actuarial 'tables, rates, or assumptions' by resolution. 20 N.C. Admin. Code 2B.0202 (2016)." Respondents contend that the cap factor is an actuarial "rate" or "assumption," and is therefore governed by 20 N.C. Admin. Code 2B.0202, a rule adopted by the Division pursuant to the authority granted it by Article 1.
 
 [14]
 
 First, we disagree with Respondents' argument that the cap factor is itself an actuarial assumption or rate that is
 
 *344
 
 governed by provisions of 20 N.C. Admin. Code 2B.0202. The cap factor must be
 
 based upon
 
 valid actuarial assumptions and rates in order for it to comply with the requirements of N.C.G.S. § 135-5(a3), but the cap factor itself is not an actuarial assumption or rate. We have held above that the cap factor is a rule that,
 
 inter alia
 
 , helps determine limits on the retirement benefits of affected State employees. Because the cap factor is a rule for the purposes of APA rule making, and the Board must comply with APA rule making provisions when adopting the cap factor, the Division is without the authority to enact rules, regulations, guidelines, or any other directives that would remove adoption of the cap factor from the requirements of APA rule making.
 

 It is not at all clear that the Board understood the cap factor to be an actuarial assumption or rate, or that it adopted the cap factor pursuant to the provisions of 20 N.C. Admin. Code 2B.0202. Therefore, this Court cannot state with any conviction that the Board, or the Division, interpreted N.C.G.S. § 135-5(a3) in the manner Respondents suggest-
 
 i.e.
 
 in a manner allowing the Board to adopt the cap factor pursuant to the rules set forth in 20 N.C. Admin. Code 2B.0202. Even assuming,
 
 arguendo
 
 , the Division has interpreted N.C.G.S. § 135-5(a3) as argued by Respondents, we hold that such an interpretation is erroneous and contrary to the law. It is this Court, not the Division, that must ultimately decide the issue now that it is before us, and we have done so.
 

 C.
 
 Policy Arguments
 

 Respondents' contention that "public comments will not improve the actuary's recommendation," even if correct, does not factor into our analysis. Assuming,
 
 arguendo
 
 , Respondents are correct that application of the rule making procedures of the APA to the adoption of a cap factor is unnecessarily inefficient, and will serve no beneficial purpose, this Court is not the proper entity to address those arguments. Appellate courts will not imply amendments to a statute
 
 *210
 
 based " 'merely out of supposed legislative intent in no way expressed,
 
 however necessary or proper it may seem to be
 
 .' "
 
 Empire Power
 
 ,
 
 337 N.C. at 591
 
 ,
 
 447 S.E.2d at 781
 
 (emphasis added) (quoting
 
 In re Assessment of Sales Tax
 
 ,
 
 259 N.C. 589
 
 , 594,
 
 131 S.E.2d 441
 
 , 445 (1963) ). "Weighing ... public policy considerations is the province of our General Assembly, not this Court [.]"
 
 Wynn v. United Health Servs./Two Rivers Health-Trent Campus
 
 ,
 
 214 N.C. App. 69
 
 , 79,
 
 716 S.E.2d 373
 
 , 382 (2011) (citations and quotation marks omitted);
 
 see also
 

 Empire Power
 
 ,
 
 337 N.C. at 595-96
 
 ,
 
 447 S.E.2d at 784
 
 .
 
 *345
 
 IV.
 
 Conclusion
 

 We hold that APA rule making provisions apply to the Board's adoption of a cap factor. The Division erred in invoicing Dr. Shepherd or Petitioner for any additional contributions pursuant to N.C.G.S. § 135-5(a3) because the cap factor adopted by the Board, and applied in determining the amount of the additional contribution Petitioner was required to pay "in order to make [Dr. Shepherd] not subject to the contribution-based benefit cap[,]" N.C.G.S. § 135-4(jj), was not properly adopted. "An agency shall not seek to implement or enforce against any person a policy, guideline, or other interpretive statement that meets the definition of a rule contained in G.S. 150B-2(8a) if [it] has not been adopted as a rule in accordance with this Article." N.C.G.S. § 150B-18. We affirm the trial court's grant of summary judgment in favor of Petitioner.
 
 [15]
 

 AFFIRMED.
 

 Judges BRYANT and STROUD concur.
 

 [1]
 

 By the time of the order granting summary judgment, Dale R. Folwell had become the State Treasurer, and had been substituted as a named Respondent.
 

 [2]
 

 TSERS is established and controlled by the provisions of Article 1 of Chapter 135 of the General Statutes ("Article 1")-
 
 N.C. Gen. Stat. §§ 135-1
 
 through 135-18.11 (2017). The APA is found in Article 2A of Chapter 150B-N.C. Gen. Stat. §§ 150B-1 through 150B-52 (2017).
 

 [3]
 

 "AN ACT to enact anti-pension-spiking legislation by establishing a contribution-based benefit cap[.]"
 
 2014 N.C. Sess. Laws 88
 
 , preamble and sec. 1.(a).
 

 [4]
 

 This is a simplified explanation of the Act, but an in-depth explanation is not required for our analysis of the issues on appeal.
 

 [5]
 

 We note that the language of N.C.G.S. § 135-4(jj) (2017) references "G.S. 128-27(a3)" instead of "G.S. 135-5(a3)." We are unable to determine why "G.S. 128-27(a3)" is included in the 2017 version of the Statute. N.C.G.S. § 135-4(jj) (2015), the version effective when this matter was heard by the trial court, references "G.S. 135-5(a3)," not "G.S. 128-27(a3)." The Session Laws do not indicate that there existed any intent to amend the statute to replace "G.S. 135-5(a3)" with "G.S. 128-27(a3)".
 
 See
 

 2015 N.C. Sess. Laws 168
 
 , sec. 7.(a), effective 1 January 2016;
 
 2017 N.C. Sess. Laws 128
 
 , sec. 2.(a), effective 20 July 2017. The section including "G.S. 128-27(a3)" was amended, or corrected, to again cite "G.S. 135-5(a3)" by
 
 2018 N.C. Sess. Laws 85
 
 , sec. 14., effective 25 June 2018. We use the 2015 version of the statute because it was in effect during the time period relevant to this appeal.
 

 [6]
 

 20 N.C. Admin. Code 02B.0202 includes rules adopted by the Division, including the procedures for adopting tables, rates, and assumptions recommended by the Division's actuary.
 

 [7]
 

 The seven additional appeals are COA17-1018, COA17-1019, COA17-1020, COA17-1021, COA17-1022, COA17-1023, and COA17-1024.
 

 [8]
 

 Because in this case Respondents are the appellants.
 

 [9]
 

 Article 2A is the section of the APA that governs rule making.
 

 [10]
 

 We again note that Respondents make no argument on appeal that the cap factor does not fall within the APA definition of a "rule."
 

 [11]
 

 Id.
 
 at 591,
 
 447 S.E.2d at 781
 
 (citations and quotation marks omitted).
 

 [12]
 

 N.C. Gen. Stat. § 143C-1-1(b) (2017) ("The provisions of this Chapter shall apply to every State agency, unless specifically exempted herein[.]"); N.C. Gen. Stat. § 143C-1-3(a)(10) (2017) (Definition: "
 
 Pension and Other Employee Benefit Trust Funds
 
 .-Accounts for resources that are required to be held in trust for the members and beneficiaries of defined benefit pension plans, defined contribution plans, other postemployment benefit plans, or other employee benefit plans.").
 

 [13]
 

 See, e.g.
 
 , N.C.G.S. § 135-6(l) to (n), concerning the purposes and duties of actuaries.
 

 [14]
 

 The question of whether the provisions of 20 N.C. Admin. Code 2B.0202 conform with the requirements of Article 1 is not before us, and we do not consider that question here.
 

 [15]
 

 We reiterate that the reasoning, holdings, and directives in this opinion apply with equal weight to the seven related appeals in COA17-1018, COA17-1019, COA17-1020, COA17-1021, COA17-1022, COA17-1023, and COA17-1024.